UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| OYSTER OPTICS, LLC, | C.A. No. 2:19-cv-00257 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| INFINERA CORPORATION, CORIANT (USA) INC., CORIANT NORTH AMERICA, LLC, and CORIANT OPERATIONS, INC., | |
| Defendants. | |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT, FRAUD, AND CONCEALMENT

This is an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 *et seq.* in which Plaintiff Oyster Optics ("Plaintiff" or "Oyster") makes the following allegations against Defendant Infinera Corporation ("Infinera") and Defendants Coriant (USA) Inc., Coriant North America, LLC, and Coriant Operations, Inc. (collectively "Coriant Defendants" and together with Infinera the "Defendants"):

## PARTIES

1.      Oyster Optics, LLC is a Texas company, and has a place of business at 11921 Freedom Drive, Suite 550, Reston, VA 20190.

2.      On information and belief, Infinera Corporation is a Delaware corporation with its principal place of business at 140 Caspian Court, Sunnyvale, CA 94089-1000. Infinera can be served through its registered agent, Corporation Service Company DBA

CSC-Lawyers INCO, 211 E. 7th Street, Suite 620, Austin, TX 78701. On information and belief, Infinera product(s) power CyrusOne's Texas Internet Exchange (IX), the first statewide IX in the United States.

3. On information and belief, Coriant (USA) Inc. is a Delaware corporation. Coriant (USA) Inc. can be served through its registered agent, National Registered Agents, Inc., at 1999 Bryan St., Ste. 900, Dallas, TX 75201.  On information and belief Coriant (USA) Inc. has been indirectly owned by Infinera since October 1, 2018.

4. On information and belief, Coriant North America, LLC. is a Delaware corporation. Coriant North America LLC can be served through its registered agent, National Registered Agents, Inc., at 1999 Bryan St., Ste. 900, Dallas, TX 75201.  On information and belief Coriant North America LLC has been indirectly owned by Infinera since October 1, 2018.

5. On information and belief, Coriant Operations, Inc. is a Delaware corporation. Coriant Operations, Inc. can be served through its registered agent, National Registered Agents, Inc., at 1999 Bryan St., Ste. 900, Dallas, TX 75201.  On information and belief Coriant Operations, Inc. has been indirectly owned by Infinera since October 1, 2018.

## JURISDICTION AND VENUE

6. This action arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7. Oyster's fraud and concealment claims arise from acts committed by the Defendants in settling an action that was pending before this Court. A copy of the

Settlement and License Agreement between Oyster and the Coriant Defendants is included as Exhibit A to Defendants' Answer, Affirmative Defenses, and Counterclaims. (Dkt. 17, Ex. A). The settlement agreement provides that disputes under that agreement shall be subject to the jurisdiction and venue of this Court. Infinera has pleaded affirmative defenses and counterclaims of release and license to Oyster's infringement claims in this action based upon the Coriant settlement agreement. Accordingly, the validity, enforceability, and interpretation of the Oyster-Coriant settlement agreement is at issue in both Oyster's patent infringement claims against Infinera and Oyster's fraud and concealment claims against the Defendants. Thus, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a). and 1367(a).

8.      This Court has personal jurisdiction over Defendants in this action because each Defendant has committed acts within the Eastern District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.  Defendants, directly and through subsidiaries or intermediaries, have committed and continue to commit acts of infringement in this District by, among other things, offering to sell and selling products and/or services that infringe the asserted patents.

9.      This Court has personal jurisdiction over Defendants in this action because, among other reasons, Defendants have committed acts within the Eastern District of Texas giving rise to this action and have established minimum contacts with the forum state of Texas. Defendants directly and/or through subsidiaries, parents, or intermediaries (including distributors, retailers, and others), have committed and continue to commit acts of infringement in this District by, among other things, making, using, importing, offering

for sale, and/or selling products and/or services that infringe the patents-in-suit. Defendants have, in prior cases, acknowledged the propriety of jurisdiction of this Court, such as in Civil Action No. 2:16-cv-1295 (E.D. Tex. November 23, 2016) and in Civil Action No. 2:16-cv-1302 (E.D. Tex. November 24, 2016). Thus, Defendants purposefully availed themselves of the benefits of doing business in the State of Texas and the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Infinera is registered to do business in the State of Texas and has appointed Corporation Service Company DBA CSC-Lawyers INCO, 211 E. 7th Street, Suite 620, Austin, TX 78701 as its agent for service of process. The Coriant Defendants are registered to do business in the State of Texas, and have appointed National Registered Agents, Inc., at 1999 Bryan St., Ste. 900, Dallas, TX 75201, as their agent for service of process.

10.     Venue is proper in this District under 28 U.S.C. §§ 1391 (b)-(c) and 1400(b) because Defendants are subject to personal jurisdiction in this District, have transacted business in this District and have committed acts of patent infringement in this District. Furthermore, in prior cases brought in this District, Defendants have not challenged the propriety of venue in this District. See, e.g., Civil Action No. 2:16-cv-1295 (E.D. Tex. November 23, 2016), in Civil Action No. 2:16-cv-1302 (E.D. Tex. November 24, 2016), Civil Action No. 2:18-cv-206 (E.D. Tex. May 15, 2018). During times at which infringement alleged in this complaint occurred, Defendants have maintained one or more regular and established places of business in this District, including at 4100 Midway Road, Suite 1120, Carrollton, TX 75007.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 6,665,500

11.     Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

12.     In the early 2000s, Oyster Optics, Inc., a research, development, and engineering company, was focused upon innovation in government, commercial, security, and broad-band applications of leading edge fiber optics technology. Mr. Peter ("Rocky") Snawerdt was at Oyster Optics, Inc. when he invented the subject matter of U.S. Patent Nos. 6,665,500  ("the '500 Patent").

13.     Oyster is the owner by assignment of the '500 Patent entitled "Dual-Mode Fiber Optic Telecommunications System and Method." The '500 Patent was duly and legally issued by the United States Patent and Trademark Office on December 16, 2003. A true and correct copy of the '500 Patent is included as Exhibit A.

14.     On information and belief, Infinera has offered for sale, sold and/or imported into the United States Infinera products and services that infringe the '500 patent, and continues to do so.

15.     On information and belief, Defendants make, use, offer for sale and/or sell in the United States the products and services that infringe various claims of the '500 Patent, and continue to do so. These products include, without limitation, products utilizing Infinera's "Infinite Capacity Engine" ("ICE"). According to Infinera, ICE is a "family of optical engines [that deliver] cloud scale capacity for Infinera Intelligent Transport Networks," ICE Version 4 ("ICE 4") was first introduced in 2016, and ICE version 5 ("ICE 5") was announced in 2018. According to Infinera, ICE 4 "powers a broad range of Infinera products from the compact, disaggregated Cloud Xpress 2 and XT-Series Meshponders to

the DTN-X XTC family, serving a wide variety of metro, long haul, and subsea applications." On information and belief, the ICE 4 and ICE 5 drive Infinera's DTN, DTN-X, DTN-X-XTC, FlexILS, and Cloud Xpress platforms. The infringing products also include, without limitation, the Coriant and Infinera Groove G30 DCI Platform.  The exemplary products utilizing ICE 4 and ICE 5 and the Groove G30 named in this paragraph shall be referred to collectively hereinafter as the "Accused Instrumentalities."

16.    On information and belief, Defendants have directly infringed and continue to infringe the '500 Patent, for example, by making, selling, offering for sale, and/or importing the Accused Instrumentalities, and through their own use and testing of the Accused Instrumentalities, which constitute the optical data transmitter of Claim 1 of the  '500 Patent comprising a laser; a phase modulator for phase modulating light from the light source; and a controller having an input for receiving an electronic data stream, the controller in a first mode controlling the phase modulator so as to create phase-modulated optical signals in the light from the laser as a function of the electronic data stream and the controller in a second alternate mode amplitude-modulating the light from the laser as a function of the electronic data stream, the first mode and the second mode occurring at different times.   Upon information and belief, Defendants use the Accused Instrumentalities, which are infringing systems, for their own internal non-testing business purposes, while testing the Accused Instrumentalities, and while providing technical support and repair services for the Accused Instrumentalities to Defendants' customers.

17.    On information and belief, Defendants knew of the '500 Patent and knew of their infringement, including by way of this lawsuit. By the time of trial, Defendantswill

have known and intended (since receiving such notice) that their continued actions would actively induce and contribute to the infringement of the claims of the '500 Patent.

18. On information and belief, use of the Accused Instrumentalities in their ordinary and customary fashion results in infringement of the claims of the '500 Patent.

19. Defendants' affirmative acts of making, using, selling, offering for sale, and/or importing the Accused Instrumentalities have induced and continue to induce users of the Accused Instrumentalities to use the Accused Instrumentalities in their normal and customary way to infringe the claims of the '500 Patent, knowing that when the Accused Instrumentalities are used in their ordinary and customary manner, such systems constitute on optical data transmitter comprising: a laser; a phase modulator for phase modulating light from the light source; and a controller having an input for receiving an electronic data stream, the controller in a first mode controlling the phase modulator so as to create phase-modulated optical signals in the light from the laser as a function of the electronic data stream and the controller in a second alternate mode amplitude-modulating the light from the laser as a function of the electronic data stream, the first mode and the second mode occurring at different times. Defendants also induce their customers to use the Accused Instrumentalities to infringe other claims of the '500 Patent. Defendants specifically intended and were aware that the normal and customary use of the Accused Instrumentalities on compatible systems would infringe the '500 Patent. Defendants performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '500 Patent and with the knowledge, or willful blindness to the probability, that the induced acts would constitute infringement. On information and belief, Defendants engaged in such inducement to promote the sales of the

Accused Instrumentalities, *e.g.*, through Defendants' user manuals, product support, marketing materials, demonstrations, installation support, and training materials to actively induce the users of the accused products to infringe the '500 Patent.  Accordingly, Defendants have induced and continue to induce end users of the accused products to use the accused products in their ordinary and customary way with compatible systems to make and/or use systems infringing the '500 Patent, knowing that such use of the Accused Instrumentalities with compatible systems will result in infringement of the '500 Patent. Accordingly, Defendants have been (since at least as of filing of the original complaint), and currently are, inducing infringement of the '500 Patent, in violation of 35 U.S.C. § 271(b).

20.     Defendants have also infringed, and continue to infringe, claims of the '500 patent by offering to commercially distribute, commercially distributing, making, and/or importing the Accused Instrumentalities, which are used in practicing the process, or using the systems, of the '500 patent, and constitute a material part of the invention.  Defendants know the components in the Accused Instrumentalities to be especially made or especially adapted for use in infringement of the '500 patent, not a staple article, and not a commodity of commerce suitable for substantial noninfringing use. For example, the ordinary way of using the Accused Instrumentalities infringes the patent claims, and as such, is especially adapted for use in infringement. Accordingly, Defendants have been, and currently are, contributorily infringing the '500 patent, in violation of 35 U.S.C. § 271(c).

21.     The Accused Instrumentalities include "[a]n optical data transmitter:"

**THE INFINERA INFINITE CAPACITY ENGINE (ICE)** family of optical engines delivers cloud scale capacity for Infinera Intelligent Transport Networks. Powered by the advanced electronics in Infinera's FlexCoherent® digital signal processors (DSPs) and the cutting-edge photonics of Infinera's photonic integrated circuits (PICs), ICE offers network operators the combined benefits of scalable multi-terabit super-channel capacity and industry-leading capacity-reach performance from metro to subsea distances.

| | ICE4 | ICE5 |
|---|---|---|
| Maximum capacity per wavelength | 200 Gb/s | 600 Gb/s |
| Base optical engine, number of wavelengths | 6 wavelengths | 4 wavelengths |
| Base optical engine, maximum capacity | 1.2 Tb/s | 2.4 Tb/s |
| Maximum capacity per fiber (C-Band) | 27.6 Tb/s | approximately 40 Tb/s |
| Supported modulations | BPSK thru 16QAM | QPSK thru 64QAM |
| Transmission symbol rate | flexible, 17-33 gigabaud | flexible, 33-66 gigabaud |
| Built-in encryption support | Yes | Yes |

**Table 1.** ICE Generations at a Glance

https://www.infinera.com/wp-content/uploads/2016/03/Infinera-BR_Infinite-Capacity-Engine.pdf.

## FEATURING MODULARITY AS A BUSINESS ENABLER

The innovative three-tier modular concept of the Coriant Groove™ G30 DCI Platform provides a number of competitive advantages to DCI and telecom network planners and architects. The Coriant Groove™ G30 DCI Platform supports up to four field replaceable, individually configurable and hot-swappable 400G sleds (or field replaceable units). Each 400G sled can be equipped with up to two 200G line side interfaces (CFP2-ACO) and up to four 100G client side interfaces (QSFP28). Another 400G sled variant supporting a mix of 10G, 40G, and 100G clients is also available. The sleds and the pluggable interfaces can be purchased and deployed one at a time as required.

Coriant Groove G30 DCI Platform Data Sheet at 1.

9



Implementation Agreement for CFP2-Analogue Coherent Optics Module, OIF-CFP2-ACO-01.0, at 14.

22.    The Accused Instrumentalities include "a laser:"

**Cutting-edge Photonics**

Infinera PIC technology has clocked over two billion field hours, lighting up over two million kilometers of fiber. The PIC technology within the Infinera Infinite Capacity Engine integrates several hundred optical functions, including tuneable lasers, photodiodes, nested Mach-Zehnder modulators, demodulators, splitters, combiners, attenuators and amplifiers. The PIC is designed to

https://www.infinera.com/wp-content/uploads/2016/03/Infinera-BR_Infinite-Capacity-Engine.pdf.

> • Laser Safety: ANSI Class 1M, IEC Class 1M, EN 60825-1/2, 21 CFR 1040 US FDA CDRH, Laser Safety

Coriant Groove G30 DCI Platform Data Sheet at 4.



Implementation Agreement for CFP2-Analogue Coherent Optics Module, OIF-CFP2-ACO-01.0, at 14.

    23.    The Accused Instrumentalities include "a phase modulator for phase modulating light from the light source."  For example, the Accused Instrumentalities use BPSK and/or QPSK phase modulation.

### Cutting-edge Photonics

Infinera PIC technology has clocked over two billion field hours, lighting up over two million kilometers of fiber. The PIC technology within the Infinera Infinite Capacity Engine integrates several hundred optical functions, including tuneable lasers, photodiodes, nested Mach-Zehnder modulators, demodulators, splitters, combiners, attenuators and amplifiers. The PIC is designed to

|  | ICE4 | ICE5 |
|---|---|---|
| Maximum capacity per wavelength | 200 Gb/s | 600 Gb/s |
| Base optical engine, number of wavelengths | 6 wavelengths | 4 wavelengths |
| Base optical engine, maximum capacity | 1.2 Tb/s | 2.4 Tb/s |
| Maximum capacity per fiber (C-Band) | 27.6 Tb/s | approximately 40 Tb/s |
| Supported modulations | BPSK thru 16QAM | QPSK thru 64QAM |
| Transmission symbol rate | flexible, 17-33 gigabaud | flexible, 33-66 gigabaud |
| Built-in encryption support | Yes | Yes |

**Table 1.** ICE Generations at a Glance

https://www.infinera.com/wp-content/uploads/2016/03/Infinera-BR_Infinite-Capacity-Engine.pdf.

**LEVERAGING PROGRAMMABLE MODULATION FORMATS**

Powered by Coriant CloudWave™ Optics, the Coriant Groove™ G30 DCI Platform supports programmable DWDM line interface bandwidth and performance to optimize high-capacity transmission from 100G to 400G in metro, regional, or long-haul DCI applications. The Coriant Groove™ G30 DCI Platform features three different user programmable line modulation formats to further cost optimize each network design for optimal transparent reach and fiber spectral utilization. Each of the sixteen Coriant Groove™ G30 DCI Platform line side ports can be independently configured as either 100G DP-QPSK, 150G DP-8QAM, or 200G DP-16QAM. Paired with the Coriant® Pluggable Optical Layer that features pluggable form factor amplifiers, variable optical attenuators, power monitoring, combiners, splitters, WSS, and all other functions, the Coriant® Groove™ G30 DCI Platform is the simplest, most flexible, and most efficient DCI solution currently available.

| Modulation Scheme | Application | Fiber Capacity | Reach | Forward Error Correction |
|---|---|---|---|---|
| DP-QPSK | Long Haul | 9.6 Tbps | Up to 4000 km | Up to 25% SDFEC |
| DP-8QAM | Regional | 19.2 Tbps | Up to 2000 km | Up to 25% SDFEC |
| DP-16QAM | Metro, Metro Edge | 25.6 Tbps | Up to 1000 km | Up to 25% SDFEC |

Coriant Groove G30 DCI Platform Data Sheet at 2.

24.     The Accused Instrumentalities further include "a controller having an input for receiving electronic data":

## Advanced Electronics

The FlexCoherent DSPs in ICE are designed to deliver sophisticated digital signal handling, with transmitter-based (Tx) processing and enhanced receiver-based (Rx) capability, industry-leading coherent performance and complementary features to enhance network security and availability.

| | ICE4 | ICE5 |
|---|---|---|
| Maximum capacity per wavelength | 200 Gb/s | 600 Gb/s |
| Base optical engine, number of wavelengths | 6 wavelengths | 4 wavelengths |
| Base optical engine, maximum capacity | 1.2 Tb/s | 2.4 Tb/s |
| Maximum capacity per fiber (C-Band) | 27.6 Tb/s | approximately 40 Tb/s |
| Supported modulations | BPSK thru 16QAM | QPSK thru 64QAM |
| Transmission symbol rate | flexible, 17-33 gigabaud | flexible, 33-66 gigabaud |
| Built-in encryption support | Yes | Yes |

**Table 1.** ICE Generations at a Glance

https://www.infinera.com/wp-content/uploads/2016/03/Infinera-BR_Infinite-Capacity-Engine.pdf.



Implementation Agreement for CFP2-Analogue Coherent Optics Module, OIF-CFP2-ACO-01.0, at 14.

25.     The Accused Instrumentalities further include "the controller in a first mode controlling the phase modulator so as to create phase-modulated optical signals in the light from the laser as a function of the electronic data stream":

| | ICE4 | ICE5 |
|---|---|---|
| Maximum capacity per wavelength | 200 Gb/s | 600 Gb/s |
| Base optical engine, number of wavelengths | 6 wavelengths | 4 wavelengths |
| Base optical engine, maximum capacity | 1.2 Tb/s | 2.4 Tb/s |
| Maximum capacity per fiber (C-Band) | 27.6 Tb/s | approximately 40 Tb/s |
| Supported modulations | BPSK thru 16QAM | QPSK thru 64QAM |
| Transmission symbol rate | flexible, 17-33 gigabaud | flexible, 33-66 gigabaud |
| Built-in encryption support | Yes | Yes |

**Table 1.** ICE Generations at a Glance

## Advanced Electronics

The FlexCoherent DSPs in ICE are designed to deliver sophisticated digital signal handling, with transmitter-based (Tx) processing and enhanced receiver-based (Rx) capability, industry-leading coherent performance and complementary features to enhance network security and availability.

## Cutting-edge Photonics

Infinera PIC technology has clocked over two billion field hours, lighting up over two million kilometers of fiber. The PIC technology within the Infinera Infinite Capacity Engine integrates several hundred optical functions, including tuneable lasers, photodiodes, nested Mach-Zehnder modulators, demodulators, splitters, combiners, attenuators and amplifiers. The PIC is designed to

https://www.infinera.com/wp-content/uploads/2016/03/Infinera-BR_Infinite-Capacity-Engine.pdf.

## LEVERAGING PROGRAMMABLE MODULATION FORMATS

Powered by Coriant CloudWave™ Optics, the Coriant Groove™ G30 DCI Platform supports programmable DWDM line interface bandwidth and performance to optimize high-capacity transmission from 100G to 400G in metro, regional, or long-haul DCI applications. The Coriant Groove™ G30 DCI Platform features three different user programmable line modulation formats to further cost optimize each network design for optimal transparent reach and fiber spectral utilization. Each of the sixteen Coriant Groove™ G30 DCI Platform line side ports can be independently configured as either 100G DP-QPSK, 150G DP-8QAM, or 200G DP-16QAM. Paired with Coriant® Pluggable Optical Layer that features pluggable form factor amplifiers, variable optical attenuators, power monitoring, combiners, splitters, WSS, and all other functions, the Coriant Groove™ G30 DCI Platform is the simplest, most flexible, and most efficient DCI solution currently available.

| Modulation Scheme | Application | Fiber Capacity | Reach | Forward Error Correction |
|---|---|---|---|---|
| DP-QPSK | Long Haul | 9.6 Tbps | Up to 4000 km | Up to 25% SDFEC |
| DP-8QAM | Regional | 19.2 Tbps | Up to 2000 km | Up to 25% SDFEC |
| DP-16QAM | Metro, Metro Edge | 25.6 Tbps | Up to 1000 km | Up to 25% SDFEC |

Coriant Groove G30 DCI Platform Data Sheet at 2.

19.    The Accused Instrumentalities further include "the controller in a second alternate mode amplitude-modulating the light from the laser as a function of the electronic data stream":

|  | ICE4 | ICE5 |
|---|---|---|
| Maximum capacity per wavelength | 200 Gb/s | 600 Gb/s |
| Base optical engine, number of wavelengths | 6 wavelengths | 4 wavelengths |
| Base optical engine, maximum capacity | 1.2 Tb/s | 2.4 Tb/s |
| Maximum capacity per fiber (C-Band) | 27.6 Tb/s | approximately 40 Tb/s |
| Supported modulations | BPSK thru 16QAM | QPSK thru 64QAM |
| Transmission symbol rate | flexible, 17-33 gigabaud | flexible, 33-66 gigabaud |
| Built-in encryption support | Yes | Yes |

**Table 1.** ICE Generations at a Glance

### Advanced Electronics

The FlexCoherent DSPs in ICE are designed to deliver sophisticated digital signal handling, with transmitter-based (Tx) processing and enhanced receiver-based (Rx) capability, industry-leading coherent performance and complementary features to enhance network security and availability.

16

**Cutting-edge Photonics**

Infinera PIC technology has clocked over two billion field hours, lighting up over two million kilometers of fiber. The PIC technology within the Infinera Infinite Capacity Engine integrates several hundred optical functions, including tuneable lasers, photodiodes, nested Mach-Zehnder modulators, demodulators, splitters, combiners, attenuators and amplifiers. The PIC is designed to

https://www.infinera.com/wp-content/uploads/2016/03/Infinera-BR_Infinite-Capacity-Engine.pdf.

**LEVERAGING PROGRAMMABLE MODULATION FORMATS**

Powered by Coriant CloudWave™ Optics, the Coriant Groove™ G30 DCI Platform supports programmable DWDM line interface bandwidth and performance to optimize high-capacity transmission from 100G to 400G in metro, regional, or long-haul DCI applications. The Coriant Groove™ G30 DCI Platform features three different user programmable line modulation formats to further cost optimize each network design for optimal transparent reach and fiber spectral utilization. Each of the sixteen Coriant Groove™ G30 DCI Platform line side ports can be independently configured as either 100G DP-QPSK, 150G DP-8QAM, or 200G DP-16QAM. Paired with the Coriant® Pluggable Optical Layer that features pluggable form factor amplifiers, variable optical attenuators, power monitoring, combiners, splitters, WSS, and all other functions, the Coriant Groove™ G30 DCI Platform is the simplest, most flexible, and most efficient DCI solution currently available.

| Modulation Scheme | Application | Fiber Capacity | Reach | Forward Error Correction |
|---|---|---|---|---|
| DP-QPSK | Long Haul | 9.6 Tbps | Up to 4000 km | Up to 25% SDFEC |
| DP-8QAM | Regional | 19.2 Tbps | Up to 2000 km | Up to 25% SDFEC |
| DP-16QAM | Metro, Metro Edge | 25.6 Tbps | Up to 1000 km | Up to 25% SDFEC |

Coriant Groove G30 DCI Platform Data Sheet at 2.

20.     The Accused Instrumentalities further include "the first mode and the second mode occurring at different times."  For example, the Accused Instrumentalities transmit using PSK or QAM on a given wavelength at different times:

| | ICE4 | ICE5 |
|---|---|---|
| Maximum capacity per wavelength | 200 Gb/s | 600 Gb/s |
| Base optical engine, number of wavelengths | 6 wavelengths | 4 wavelengths |
| Base optical engine, maximum capacity | 1.2 Tb/s | 2.4 Tb/s |
| Maximum capacity per fiber (C-Band) | 27.6 Tb/s | approximately 40 Tb/s |
| Supported modulations | BPSK thru 16QAM | QPSK thru 64QAM |
| Transmission symbol rate | flexible, 17-33 gigabaud | flexible, 33-66 gigabaud |
| Built-in encryption support | Yes | Yes |

**Table 1.** ICE Generations at a Glance

https://www.infinera.com/wp-content/uploads/2016/03/Infinera-BR_Infinite-Capacity-Engine.pdf.

**LEVERAGING PROGRAMMABLE MODULATION FORMATS**

Powered by Coriant CloudWave™ Optics, the Coriant Groove™ G30 DCI Platform supports programmable DWDM line interface bandwidth and performance to optimize high-capacity transmission from 100G to 400G in metro, regional, or long-haul DCI applications. The Coriant Groove™ G30 DCI Platform features three different user programmable line modulation formats to further cost optimize each network design for optimal transparent reach and fiber spectral utilization. Each of the sixteen Coriant Groove™ G30 DCI Platform line side ports can be independently configured as either 100G DP-QPSK, 150G DP-8QAM, or 200G DP-16QAM. Paired with the Coriant® Pluggable Optical Layer that features pluggable form factor amplifiers, variable optical attenuators, power monitoring, combiners, splitters, WSS, and all other functions, the Coriant® Groove™ G30 DCI Platform is the simplest, most flexible, and most efficient DCI solution currently available.

| Modulation Scheme | Application | Fiber Capacity | Reach | Forward Error Correction |
|---|---|---|---|---|
| DP-QPSK | Long Haul | 9.6 Tbps | Up to 4000 km | Up to 25% SDFEC |
| DP-8QAM | Regional | 19.2 Tbps | Up to 2000 km | Up to 25% SDFEC |
| DP-16QAM | Metro, Metro Edge | 25.6 Tbps | Up to 1000 km | Up to 25% SDFEC |

Coriant Groove G30 DCI Platform Data Sheet at 2.

19.    Defendants also infringe other claims of the '500 Patent, directly and through inducing infringement and contributory infringement.

20.    By making, using, offering for sale, selling and/or importing into the United States the Accused Instrumentalities, and touting the benefits of using the Accused Instrumentalities' accused features, Defendants have injured Oyster and are liable to Oyster for infringement of the '500 Patent pursuant to 35 U.S.C. § 271.

18

21.     As a result of Defendants' infringement of the '500 Patent, Plaintiff Oyster is entitled to monetary damages in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court.

## COUNT II
## FRAUD

22.     Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

23.     Oyster is a patent-licensing entity, which exists to license its patented technologies and whose revenue depends entirely on obtaining license payments from companies that use, have used, or would like to use its patented technologies.

24.     On November 24, 2016, Plaintiff, Oyster, filed a complaint for patent infringement in the United States District Court for the Eastern District of Texas against Coriant America Inc. and Tellabs, Inc. alleging infringement of various patents (Case No. 2:16-CV-01302-JRG) (the "2016 Coriant Litigation"). Around the same time, Plaintiff Oyster filed separate infringement actions ("Pending Actions Against Other Named Defendants") in the Eastern District of Texas, covering unrelated, competitive telecommunications products made and sold by competitors of the Coriant Defendants, such as Infinera, Alcatel-Lucent USA, Inc., Ciena Corporation, and Cisco Systems, Inc. On February 24, 2017, Oyster filed an amended complaint in the 2016 Coriant Litigation, naming the Coriant Defendants as defendants.

25.     On November 23, 2016, Oyster filed a complaint for patent infringement in the Eastern District of Texas against Infinera Corporation, alleging infringement of various patents (Case No. 2:16-CV-01295-JRG).

26.     Oyster's patent lawsuits in the Eastern District of Texas against the Coriant Defendants, Infinera, and their competitors were consolidated for all pretrial issues, including discovery, claim construction, and summary judgment. From the outset, the defendants in these consolidated lawsuits formed a joint defense group and coordinated closely on their consolidated matters, including on their challenges to the validity of Oyster's patents and on the scheduling of various pretrial events.

27.     On May 15, 2018, Oyster filed a second complaint for patent infringement in the Eastern District of Texas against Infinera Corporation. On June 8, 2018, Oyster's two patent lawsuits against Infinera were consolidated into a single case (Case No. 2:18-cv-00206) (the "Infinera Litigation").

28.     In the 2016 Coriant Litigation, Plaintiff Oyster accused certain Coriant products ("Coriant Accused Products") of infringing asserted claims of its various patents. The 2016 Coriant Litigation progressed through discovery.

29.     Throughout the 2016 Coriant Litigation, the Defendants represented, through discovery responses and settlement discussions under Federal Rules of Evidence Rule 408, that there was no overlap between the Coriant Accused Products and the products of the other defendants named in the separately filed cases, such as Infinera.

30.     As set forth in further detail below, during each discussion or mediation with Coriant, Oyster made clear that the price of the settlement—i.e., the licensing revenue that it would receive from Coriant—was by far the most important term, and that this settlement price depended on Coriant's market share compared to the defendants in Oyster's other lawsuits. Oyster used the same approach with the other defendants, tying

the price of a license for a particular defendant to its market share in the technology covered by Oyster's patents.

31.     Coriant confirmed that it understood that Oyster insisted that the settlement price depended on market share and negotiated with Oyster on this basis. Coriant made use of its claimed market share of 8-10% in the relevant market to negotiate a settlement with Oyster.

32.     At the same time, while Oyster-Coriant settlement discussions were ongoing, Coriant entered into discussions with Infinera for the purpose of exploring a complete purchase by Infinera of the Coriant Defendants' assets. Coriant never disclosed any information or documents reflecting these discussions during discovery of the 2016 Coriant Litigation, despite an ongoing obligation to do so under Local Rules of the Eastern District of Texas. Instead of disclosing this information, Coriant called retired United States District Judge David Folsom, the court assigned mediator, to schedule an immediate mediation between it and Plaintiff Oyster.

33.     That mediation—which had the stated goal of settling the 2016 Coriant Litigation and only the Coriant Litigation—was scheduled for the second week of April 2018.

34.     During the mediation, held April 11, 2018 in Dallas, Texas, the two sides conducted settlement negotiations, both through Judge Folsom and directly, to settle the 2016 Coriant Litigation. Oyster communicated to the Coriant Defendants that its settlement demands were based in large part on Coriant's relative market share and on Coriant's willingness to settle its case first amongst all the named defendants. During the mediation, Coriant made specific references to the market share of other infringers, arguing for

example that Coriant's price to settle should be reduced because it was "half the size" of Infinera. Thus, before the first offer was given—and again and again throughout the day—the two sides discussed market share information and other pertinent information to assist them with furthering the goal of settling only the 2016 Coriant Litigation. To this end, Oyster also communicated to the Coriant Defendants that a settlement would provide Coriant final resolution of Oyster's asserted patent claims on its products, but not any of the products of the other named defendants in the Pending Actions Against Other Named Defendants. Likewise, throughout the day, Coriant asked if there were any way to get a much lower settlement demand if the Coriant Defendants were the "first movers"—as compared to the other named defendants—in obtaining a license to the particular patent families at issue. As a sign of good faith, Oyster agreed to a significant discount for Coriant for this reason.

35.    During the April 11, 2018 mediation session, understanding that these points were the main premise and guiding framework on which the settlement-demand price was based, the Coriant Defendants agreed, and the parties were able to enter a Memorandum of Understanding or "MOU" based on them. Oyster's outside counsel, acting on behalf of Oyster, and Coriant's outside counsel, acting on behalf of Coriant, exchanged emails on April 11, 2018, expressing their respective parties' agreement to the MOU. The settlement framework was stated in the MOU itself as a "settlement of the current case." And the fact that it was a "significant one-time discount" vis-à-vis other named defendants was so important that the parties decided to identify them expressly in the MOU.

36.     Throughout the April 11, 2018 mediation session, the Coriant Defendants never communicated to Oyster or the mediator, Judge Folsom, that they were in serious negotiations to be purchased by Infinera, even after they learned the proposed settlement amount was based on the risks and cost and size of the 2016 Coriant Litigation as compared to the other Pending Actions Against Other Named Defendants and also after they were able to get a significant one-time discount based purely on the fact that they were "first movers" in comparison to other named defendants. In short, Coriant knew that the single most material term of the MOU was the price of the settlement and knew it was calculated and premised on settling the 2016 Coriant Litigation and not the other Pending Actions Against Other Named Defendants, but stayed silent and kept their negotiations with Infinera hidden from Oyster.

37.     Indeed, after learning how material the scope of the license was to the price, the Coriant Defendants did not just remain silent, but to obtain a lower price for the release and license they stated, to Oyster and Judge Folsom, that if they were able to quickly settle the case, they would discuss their willingness to assist Oyster in obtaining higher licensing value from the other named defendants in the other Pending Actions Against Other Named Defendants. This would be done by obtaining a broader portfolio license and assisting Oyster in another assertion campaign, before the International Trade Commission, against the defendants in the Pending Actions Against Other Named Defendants. Indeed, from before their MOU was signed, to the draft "longform" agreement the parties circulated, and all the way up to the final executed longform settlement agreement, the Coriant Defendants actively stated their intent to only settle the 2016 Coriant Litigation.

38.     But the Coriant Defendants clearly knew these statements—and the omission of facts they knew were critical to the price and the MOU itself—were false and misleading in light of the Defendants' later plan that Infinera pursue a release and license defense based upon Oyster's settlement with Coriant. In particular, the Coriant Defendants knowingly and intentionally misstated the revenue of products that would be covered by Oyster's settlement with them, by comparing their own revenue to Infinera's and implying that Infinera's revenues would not be covered by the settlement.

39.     The secret negotiations between Infinera and Coriant continued to make significant progress while the settlement discussions continued with Oyster. The Defendants never disclosed this fact to Oyster. This is true despite: (a) Defendants' ongoing obligations to produce all relevant documents in the 2016 Coriant Litigation and the Infinera Litigation; (b) the Coriant Defendants' separate obligation to disclose facts knowing they were material to the settlement agreement; and (c) all being done in light of the Coriant Defendants' plan for Infinera to pursue a release and license defense after Coriant was acquired by Infinera.

40.     To the contrary, the Defendants did just the opposite. They continued to keep these facts silent and actively prevented their disclosure to Oyster and mediator Judge Folsom.

41.     The Defendants went beyond mere omission of material facts in their effort to orchestrate their fraudulent scheme. On April 27, 2018, in an email from Coriant's outside counsel to Oyster's outside counsel, the Coriant Defendants provided redline revisions to the draft settlement agreement. But instead of communicating the hidden secret information behind Coriant's redlines—and the plans Coriant had behind them—the

Coriant Defendants instead characterized those redlines, in Coriant's outside counsel's email, as not actually "extensive." And later, in an email sent by Coriant's outside counsel to Oyster's outside counsel on May 30, 2018, the Coriant Defendants actually represented that they still only intended to cover the Coriant Defendants, their customers and their suppliers—and no one else.

42.     Nevertheless, Oyster specifically added several additional safeguards to the settlement agreement's release, to further effectuate and memorialize its limits as well as the parties' discussions and premises around them.  These included: (a) clarifying that the limited scope of the release covered only those activities that were "asserted or assertible" up to "the Effective Date;" (b) expressly excluding from its scope all products that had been sold by "Third Parties"; and (c) asking for—and expressly obtaining—a representation and warranty from the Coriant Defendants and their Affiliates that there was no overlap between their product sales activities and the products of "any of the other named Defendants in the Consolidated Litigation." If that ever were untrue, the remedy would be to exclude those other products from the scope of the release. Oyster also included an anti-circumvention clause, to prevent any attempt by a party to the contract to ever "circumvent or frustrate" the purposes of it, which plainly were to settle only the 2016 Coriant Litigation between the Coriant Defendants and Oyster. In other words, Oyster made clear the limits on the scope of the release and license and asked for additional representations to protect Oyster's interests.

43.     Oyster also limited the scope of the license to certain of Oyster's patents. While Oyster was willing to license its entire portfolio to Coriant for an appropriate price, Coriant opted to license only the patents that had been asserted against it by Oyster and

other patents related to those asserted patents in certain ways and thereby to pay a lower price to settle with Oyster. Accordingly, the list of patents licensed by Oyster to Coriant in the settlement agreement excludes the '500 patent.

44.     Oyster and Coriant had several phone calls, including with Judge Folsom, and the Coriant Defendants never once mentioned their ongoing negotiations to be acquired by Infinera. Instead, they misdirected the conversations and confirmed, both in talks and the May 30, 2018 email from Coriant's outside counsel to Oyster's outside counsel, that they wanted to quell any concerns that they were "increas[ing] the scope of the rights conveyed" in the MOU. They also stated and suggested, including in that email, the scope of the release could go no further than covering their current customers and suppliers of their own products.

45.     Oyster and the Coriant Defendants finally signed their settlement agreement on June 28, 2018 ("Oyster-Coriant Settlement and License Agreement").

46.     Days later, in July 2018, the Coriant Defendants immediately formally completed their negotiations to be acquired by Infinera and only then publicly announced the planned acquisition. On information and belief, the Oyster-Coriant Settlement and License Agreement assisted Coriant in obtaining Infinera's agreement to purchase it and in obtaining a more favorable price from Infinera.

47.     On October 1, 2018, Infinera closed its acquisition of Coriant and acquired ownership of the Coriant Defendants. On October 26, 2018, Infinera amended its answer in the Infinera Litigation to add affirmative defenses of release and license. Infinera contended that it was a third-party beneficiary of the release and license granted by Oyster in its settlement with the Coriant Defendants. On November 29, 2018, Infinera moved for

summary judgment that Oyster's patent infringement claims were barred by Infinera's release and license defenses. On June 25, 2019, Infinera's motion for summary judgment was granted, and on June 28, 2019 judgment was entered in Infinera's favor. In granting Infinera summary judgment, the court relied upon language added to the settlement agreement in the Coriant Defendants' April 27, 2018 redline revisions. In deciding summary judgment, the court did not address the issue of whether Oyster was fraudulently induced to enter into the settlement agreement.

48.     From at least the date their negotiations with Infinera began, through the signing of the Oyster-Coriant Settlement and License Agreement, the Defendants were in possession of the highly material fact that Infinera intended to purchase the Coriant Defendants. The Defendants were aware that Oyster did not know these material facts and that Oyster was acting on the basis of its mistaken belief that the Coriant Defendants were dealing with it in good faith.

49.     The Defendants made the statements set forth above—including statements concerning the claims and products Coriant sought to cover in the release and license, and concerning the practical effects of redlines that they proposed—and failed to disclose the material facts set forth above with an intent to deceive Oyster concerning the planned acquisition of the Coriant Defendants by Infinera and concerning Coriant's goals in negotiating and executing the Oyster-Coriant Settlement and License Agreement.

50.     Oyster justifiably relied upon the bad-faith representations made by the Coriant Defendants and were harmed by the Defendants' silence regarding these material facts. In reliance upon the misrepresentations and omissions of material fact by the Defendants, Oyster was fraudulently induced to enter into the Oyster-Coriant Settlement

and License Agreement containing a release and license that Infinera subsequently contended extended to cover its own acts of patent infringement of Oyster's patents. Without Defendants' misrepresentations and omissions of material fact, Oyster would not have entered into the Oyster-Coriant Settlement and License Agreement without further modifications to its terms and would not have suffered the harms that have resulted from that agreement.

51.     As a proximate result of these misrepresentations and omissions of material fact, Oyster's patent infringement claims against Infinera have been dismissed. Oyster has thus been denied compensation—by patent infringement damages or by payment for a settlement and license—for Infinera's infringement of the Oyster patents.

52.     Oyster further faces ongoing harm from these misrepresentations and omissions of material fact. For example, in its initial Complaint in this action, Oyster asserted the '500 patent against Infinera; Defendants have asserted affirmative defenses of express license, implied license, and release, as well as counterclaims for a declaratory judgment of validity and enforceability of the Oyster-Coriant Settlement and License Agreement and for a declaratory judgment of express or implied license and release. Thus, Defendants' misrepresentations and omissions of material fact threaten to deprive Oyster of compensation for Infinera's infringement of the '500 patent as well, either as patent infringement damages or by payment for a settlement and license.

53.     The aforementioned conduct of the Defendants was an intentional misrepresentation, deceit, or concealment of material facts known to the Defendants with the intention on the part of the Defendants of depriving Oyster of property or legal rights or otherwise causing injury, and constitutes malicious and oppressive conduct that

subjected Oyster to a cruel and unjust hardship in conscious disregard of Oyster's rights, so as to justify an award of exemplary and punitive damages.

### COUNT III
### CONCEALMENT

54.     Plaintiff realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

55.     From at least the date the negotiations between Coriant and Infinera began, through the signing of the Oyster-Coriant Settlement and License Agreement, the Defendants were in possession of highly material facts associated with Infinera's intent to purchase the Coriant Defendants. The Defendants were aware that Oyster did not know these material facts and that Oyster was acting on the basis of its mistaken belief that the Coriant Defendants were dealing with it in good faith.

56.     The Defendants made the statements set forth above—including statements concerning the claims and products Coriant sought to cover in the release and license, and concerning the practical effects of revised draft settlement agreements they proposed—and failed to disclose the material facts set forth above with an intent to deceive Oyster concerning the planned acquisition of the Coriant Defendants by Infinera and concerning Coriant's goals in negotiating and executing the Oyster-Coriant Settlement and License Agreement.

57.     Oyster justifiably relied upon the bad faith representations made by the Coriant Defendants and were harmed by their silence regarding these material facts. Had the Defendants disclosed these facts to Oyster, Oyster reasonably would have acted differently in negotiating and entering into the Oyster-Coriant Settlement and License Agreement. Oyster was harmed by entering into the Oyster-Coriant Settlement and License

Agreement containing a release and license that Infinera subsequently contended extended to cover its own acts of patent infringement of Oyster's patents.

58.     As a proximate result of these misrepresentations and omissions of material fact, Oyster's patent infringement claims against Infinera have been dismissed. Oyster has thus been denied compensation—by patent infringement damages or by payment for a settlement and license—for Infinera's infringement of the Oyster patents.

59.     Oyster further faces ongoing harm from these misrepresentations and omissions of material fact. For example, in its initial Complaint in this action, Oyster asserted the '500 patent against Infinera; Defendants have asserted affirmative defenses of express license, implied license, and release, as well as counterclaims for a declaratory judgment of validity and enforceability of the Oyster-Coriant Settlement and License Agreement and for a declaratory judgment of express or implied license and release. Thus, Defendants' misrepresentations and omissions of material fact threaten to deprive Oyster of compensation for Infinera's infringement of the '500 patent as well, either as patent infringement damages or by payment for a settlement and license.

60.     The aforementioned conduct of the Defendants was an intentional misrepresentation, deceit, or concealment of material facts known to the Defendants with the intention on the part of the Defendants of depriving Oyster of property or legal rights or otherwise causing injury, and constitutes malicious and oppressive conduct that subjected Oyster to a cruel and unjust hardship in conscious disregard of Oyster's rights, so as to justify an award of exemplary and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Oyster respectfully requests that this Court enter:

a.      A judgment in favor of Plaintiff that Defendants have infringed, either literally and/or under the doctrine of equivalents the '500 Patent;

b.      A permanent injunction prohibiting Defendants from further acts of infringement of the '500 Patent;

c.      A judgment reforming and/or revising the Oyster-Coriant Settlement and License Agreement so as to express the intention of the parties; or, in the alternative, a judgment rescinding such portions of the Oyster-Coriant Settlement and License Agreement as the Court may deem just and proper;

d.      A judgment and order requiring Defendants to pay Plaintiff its damages, costs, expenses, and prejudgment and post-judgment interest for its infringement of the asserted patents, as provided under 35 U.S.C. § 284;

e.      A judgment and order requiring Defendants to provide an accounting and to pay supplemental damages to Oyster, including without limitation, prejudgment and post-judgment interest;

f.      A judgment and order requiring Defendants to pay punitive damages in an amount appropriate to punish the Defendants and to deter others from engaging in similar misconduct;

g.      A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Plaintiff its reasonable attorneys' fees against Defendants; and

h.      Any and all other relief as the Court may deem appropriate and just under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

Dated:  October 28, 2019                              Respectfully submitted,

*/s/ Reza Mirzaie*
Marc A. Fenster (CA SBN 181067)
Reza Mirzaie (CA SBN 246953)
Paul Kroeger (CA SBN 229074)
Neil Rubin (CA SBN 250761)
**RUSS AUGUST & KABAT**
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025
(310) 826-7474
mfenster@raklaw.com
rmirzaie@raklaw.com
pkroeger@raklaw.com
nrubin@raklaw.com

*Attorneys for Plaintiff Oyster Optics, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that the counsel of record who are deemed to have consented to electronic service are being served on October 28, 2019 with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

/s/ *Reza Mirzaie*
Reza Mirzaie