**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **OYSTER OPTICS, LLC,** | |
| **Plaintiff,** | **Civil Action No. 2:19-cv-00257** |
| **v.** | |
| **INFINERA CORPORATION, CORIANT (USA) INC., CORIANT NORTH AMERICA, LLC, and CORIANT OPERATIONS, INC.,** | |
| **Defendants.** | |

**OBJECTIONS TO REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to Federal Rule of Civil Procedure 72 and Local Rule CV-72, Defendants

Infinera Corporation, Coriant (USA) Inc., Coriant North America, LLC, and Coriant Operations,

Inc. (collectively, "Defendants") respectfully submit their objections to Magistrate Judge Payne's

Claim Construction Memorandum Opinion and Order [Dkt. No. 88] ("R&R").  The R&R

construes the term "phase modulate" in U.S. Patent No. 6,665,500 (the "'500 patent"), to mean

"alter the phase of light to create an optical signal having a phase that is representative of data."

Dkt. No. 88 at 16.  The R&R's construction conflicts with this Court's previous construction of

the same term in related litigation between the parties, which explicitly excluded the use of

amplitude modulation.  *See* Dkt. No. 73 at 3-5; Dkt. No. 73-6 at 10-18.  Defendants respectfully

submit that the R&R's departure from this Court's previous construction arose from a

misreading of the specification and not accounting for the disclosure of U.S. Patent No.

6,594,055, which is fully incorporated into the '500 patent by reference.  The intrinsic record as a

whole is not materially different from the intrinsic record in the previous cases.  Thus, the term

"phase modulate" should be construed to exclude amplitude modulation in this case, just as this

Court concluded in the previous cases.  Defendants therefore respectfully seek an order

reinstating the construction of "phase modulate" from the prior litigation, *i.e.*, to "alter the phase

of light to create an optical signal having a phase that is representative of data. Use of phase

modulation excludes use of amplitude modulation."  Dkt. No. 73 at 10; Dkt. No. 73-6 at 18.

This Court has already twice construed the term "phase modulate" for Oyster patents

arising from the same work by the same named inventor at the same time.  Dkt. No. 73 at 3-5;

Dkt. No. 73-6 at 10-18; Dkt. No. 73-8 at 6-9.  It rejected Oyster's construction—the same

construction adopted by the R&R, Dkt. No. 73-6 at 10-18, —and then later clarified its

construction by adopting the very same construction proposed by Defendants in this case, Dkt.

No. 73-8 at 6-9.  In holding that "phase modulate" excludes amplitude modulation, this Court

emphasized that Oyster's patents' specifications repeatedly "distinguish[]" between phase

modulation and amplitude modulation and "disparage amplitude-modulated optical signals as

being easily tapped."  Dkt. No. 73-6 at 14.  Thus, "the specification explains that the desired

benefits of phase modulation are obtained only in the *absence* of amplitude modulation."  *Id.* at

17 (original emphasis).  Although other intrinsic evidence suggested that amplitude modulation

and phase modulation were not "necessarily mutually exclusive," *see id.* at 12-16, this Court held

that "on balance . . . the 'phase modulate' terms should be interpreted so as to exclude amplitude

modulation."  *Id.* at 17-18.  Subsequently, even Oyster admitted that the "correct" construction

"requires phase modulation with no amplitude modulation."  Dkt. No. 73-2 at 19.  On this

record, there is no basis to depart from this Court's prior construction.

The R&R relies on two passages from the '500 patent that purportedly justify

transmission of phase-modulated signals that are also amplitude modulated.  Dkt. No. 88 at 9

(citing '500 patent at 4:37-41 and 2:41-45).  Neither of these disclosures justify departing from

the Court's prior construction of this term.  First, the Summary of the Invention section of the

specification is a reference to "the present invention" which is "a transmitter for transmitting

*either* phase-modulated *or* amplitude-modulated optical signals."  '500 Patent at 2:26-28

(emphasis added).  The R&R's conclusion that this disclosure includes a third mode in which

data is modulated using amplitude and phase modulation is incorrect.  Instead, the correct

reading is that the invention encompasses a phase-modulated transmission mode, an amplitude-

modulated mode, or both of those two modes.  *Id.* at 2:41-47.  The phrase "which can permit the

transmitter to work with different types of receivers," which immediately follows the discussing

of having both a phase and amplitude modulated mode, shows that a single transmitter can be

versatile and accommodate either phase or amplitude modulation modes. *Id.*  In other words,

this language means the two are ***alternatives*** that allow compatibility with different types of

receivers—not that they are combined, which would require a specialized receiver capable of

handling both phase and amplitude modulation together. *See id.*  Indeed, in contrast to single

mode transmitters, *e.g.*, only phase modulation transmitters or only amplitude modulation

transmitters, the patent is directed to a "dual mode" transmitter which is capable of both phase

modulation modes and amplitude modulation modes.  '500 patent at 8:12-17.  These three

transmitters account for the three types of transmitters described in the specification.

In contrast, the R&R's reading whereby the data is simultaneously both phase- and

amplitude-modulated must be incorrect because the specification never describes this purported

third mode.  The claims contain no reference to this third mode, either—they consistently

describe only two modes: one phase-modulated mode, and one amplitude-modulated mode. *See*

generally, '500 patent at cl. 1 (covering only first and second modes), cl. 10 (same), cl. 11

(receiver receives two modes), cl. 16 ("dual-mode optical transmission system"), cl. 17 ("A

method for transmitting optical data in two modes . . . .").  As a result, when understood in the

context of the specification, the R&R's conclusion that the specification discloses a modulation

mode in which the light is both phase and amplitude modulated is incorrect.

The R&R incorrectly concludes that the disclosure of a "specialized receiver" capable of

reading "mixed" optical signals means the '500 patent must be capable of transmitting such a

signal.  R&R at 10.  The receiver of the '500 patent does no such thing. The '500 patent does not

disclose a receiver capable of meaningfully receiving and decoding a signal that is both phase

and amplitude modulated.  Instead, the receiver includes "[s]witch 39" which allows the receiver

to toggle between the amplitude-modulated modes (direct and delayed) and the phase-modulated

mode.  *See* '500 patent at Fig. 2.  For example, the '500 patent teaches that in the "direct amplitude modulated" mode, the "[s]witch 39 thus set to receive an input from photodiode 35." '500 patent at 7:39-42.  In contrast, for the phase-modulation mode, switch 39 is toggled to route signals from an interferometer 40 to the output 37.  *Id.* at 7:12-31. The switch 39 is capable of routing either amplitude or phase modulated signals—but not both—to output 37.

The R&R attempts to discount the disclosure of the switch by stating that the receiver would not "use both the phase- and amplitude-modulated components of such a mixed signal." R&R at 10 n.1.  But a receiver that simply ignores a hypothetical component of a mixed signal would be antithetical to the disclosure of the '500 patent.  If the transmitter is transmitting data along the same carrier using both amplitude and phase modulation, but the receiver simply ignores one of those modulation schemes, then the receiver could not recreate the input data at the remote end.  Thus the R&R's reliance on this disclosure of the specification is misplaced.

Second, the other portion of the specification upon which the R&R's conclusion relies expressly states that the signals "unrelated to the input optical data stream" may be amplitude modulated.  '500 patent at 4:37-41, R&R at 9.  This is consistent with Defendants' proposed construction.  To be clear, the specification of the '500 patent never teaches amplitude modulating data on the optical signal when transmitting in the secure mode, *i.e.*, phase-modulating mode.  The specification teaches that in the secure mode (phase modulation mode), if there is any amplitude modulation occurring, that "amplitude modulated signals ***not related to the input optical data stream***" could be transmitted… without necessarily affecting security." '500 patent at 4:37-41 (emphasis added).  Non-data signals may include, for example, control or other command information, could be amplitude modulated in the secure mode as long as the data being transmitted is separately phase modulated.  This is not a disclosure of a mixed phase-

modulated and amplitude-modulated data signal.  Instead it describes using two different

modulation formats for two different signals.  This disclosure is entirely consistent with the '500

patent's emphasis on security arising from the phase-modulation mode, and consistent with the

proposed construction's requirement that the data being transmitted be phase modulated ("alter

the phase of light to create an optical signal having a phase that is representative of data…").

Moreover, the specification of the '500 patent repeatedly and explicitly incorporates by

reference the '055 patent in its entirety.  *See, e.g.*, '500 patent at 2:51-57.  The '055 patent

discloses a secure fiber optic data transmission system that uses only constant-amplitude phase-

modulated optical signals due to their enhanced security and denigrates amplitude modulation as

non-secure just like the '500 patent.  '055 patent at 1:29-38.  The R&R's construction negates the

security aspects to which the '500 and '055 patent are directed.  Importantly, there is a heavy

presumption "that the same claim term in the same patent or related patents carries the same

construed meaning."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003).

Giving "phase modulate" a different meaning in the '500 patent from the '055 patent would

violate this principle.  After all, due to incorporation by reference, the entire text of the '055

patent is part of the '500 patent's disclosure. *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365,

1376 (Fed. Cir. 2006).  Yet, if the R&R's construction were adopted, the same term—"phase

modulate"—would mean different things in different parts of that combined disclosure.  Thus,

this construction incorrectly gives the same term different meanings between these closely

related patents, and inconsistent meanings within their own specifications.

Accordingly, Defendants respectfully submit that the Court should not adopt the opinion

in the Claim Construction Memorandum Opinion and Order and instead enter an order

construing "phase modulate" consistent with this Court's prior construction of this term.

Dated:  August 7, 2020

Respectfully submitted,

By:  */s/ Melissa R. Smith*

Melissa R. Smith
Texas Bar No. 24001351
Gillam & Smith LLP
303 South Washington Avenue
Marshall, Texas 75670
Telephone: 903-934-8450
Fax: 903-934-9257
melissa@gillamsmithlaw.com

Ruffin Cordell
  Bar No. 04820550
  cordell@fr.com
Joseph V. Colaianni
  D.C. Bar. No. 454744
  colaianni@fr.com
Indranil Mukerji
  MA Bar No. 644059
  mukerji@fr.com
Christopher Dryer
  D.C. Bar No. 1022460
  dryer@fr.com
FISH & RICHARDSON P.C.
1000 Maine Ave., S.W., Suite 1000
Washington, D.C.  20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

*Attorneys for Defendants*
*Infinera Corporation, Coriant (USA) Inc.,*
*Coriant North America, LLC, and*
*Coriant Operations, Inc.*

1

2

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that counsel of record who are deemed to have consented

to electronic service are being served with a true and correct copy of this document *via* the Court's

CM/ECF system per Local Rule CV-5(a)(3) on this 7th day of August, 2020.


*/s/ Melissa R. Smith*
Melissa R. Smith