IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| **OYSTER OPTICS, LLC,**<br><br>       Plaintiff,<br><br>v.<br><br>**INFINERA CORPORATION, CORIANT (USA) INC., CORIANT NORTH AMERICA, LLC, and CORIANT OPERATIONS, INC.,**<br><br>       Defendants. | Civil Action No. 2:19-cv-00257 |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY
JUDGMENT REGARDING THEIR RELEASE AND EXHAUSTION
<u>DEFENSES UNDER THE FUJITSU SETTLEMENT</u>**

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................. 1

II. STATEMENT OF THE ISSUES........................................................................... 1

III. STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................... 2

    A. The Patent-in-Suit ...................................................................................... 2

    B. The Oyster-Fujitsu Agreement .................................................................. 3

    C. Prior Litigation Regarding the OFA .......................................................... 3

    D. Defendants' Relevant Products and Oyster's Contentions ....................... 4

IV. LEGAL STANDARDS ......................................................................................... 5

V. ARGUMENT......................................................................................................... 6

    A. The OFA's Release Bars Oyster's Claims Against Products Incorporating ▮
       DSPs Prior to Its Effective Date ................................................................ 6

       1. The Court's Conclusion in the Prior Litigation Is Dispositive ................... 6

       2. The Release Applies Even under Oyster's Reading of the OFA ................ 7

    B. Patent Exhaustion Bars Oyster's Claims against Products with ▮ DSPs ....... 8

       1. Oyster's Arguments against Substantial Embodiment Are Meritless......... 8

       2. Dr. Goossen's Opinion Regarding an Alleged Noninfringing Use for the
          ▮ DSPs Is Unavailing ................................................................................. 11

VI. CONCLUSION................................................................................................... 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Burke*,
  84 U.S. (17 Wall.) 453 (1873) ...................................................................................5

*Adaptix, Inc. v. AT&T Mobility LLC*,
  Nos. 6:12-cv-17, 6:12-cv-20, 6:12-cv-120, 2015 WL 12696219 (E.D. Tex.
  Sept. 29, 2015) .............................................................................................................7

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .....................................................................................................5

*Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*,
  72 F.3d 872 (Fed. Cir. 1995) .......................................................................................5

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .....................................................................................................5

*Dedier v. Grossman*,
  454 S.W.2d 231 (Tex. App. 1970) ............................................................................5, 7

*High Point Sarl v. T-Mobile USA, Inc.*,
  640 F. App'x 917 (Fed. Cir. 2016) .........................................................................10, 11

*Keurig, Inc. v. Sturm Foods, Inc.*,
  732 F.3d 1370 (Fed. Cir. 2013) .................................................................................9, 10

*LifeScan Scotland Ltd. v. Shasta Techs., LLC*,
  734 F.3d 1361 (Fed. Cir. 2013) ............................................................................. passim

*Nat'l Union Fire Ins. Co. v. CBI Indus.*,
  907 S.W.2d 517 (Tex. 1995) ........................................................................................5

*Oyster Optics, LLC v. Alcatel-Lucent USA, Inc.*,
  816 F. App'x 438 (Fed. Cir. 2020) ...........................................................................4, 11

*Pace v. Bogalusa City Sch. Bd.*,
  403 F.3d 272 (5th Cir. 2005) (*en banc*) ......................................................................7

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979) .....................................................................................................7

*Porter v. Farris*,
    No. 1:06CV293-SA-JAD, 2008 WL 3842905 (N.D. Miss. Aug. 13, 2008)..............................7

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
    533 U.S. 617 (2008)................................................................................................ *passim*

*Realtime Data, LLC v. T-Mobile USA, Inc.*,
    936 F. Supp. 2d 795 (E.D. Tex. 2013)...................................................................................5

*Stine v. Stewart*,
    80 S.W.3d 586 (Tex. 2002) (per curiam)...............................................................................5

*Vanmoor v. Wal-Mart Stores, Inc.*,
    201 F.3d 1363 (Fed. Cir. 2000).............................................................................................11

*Winters v. Diamond Shamrock Chem. Co.*,
    149 F.3d 387 (5th Cir. 1998) ..................................................................................................7

**Other Authorities**

Fed. R. Civ. P. 56(a) ........................................................................................................................5

I.      **INTRODUCTION**

Oyster settled prior litigation against Fujitsu by entering a settlement and license agreement (the "OFA," Ex. A) granting Fujitsu a license and release. In prior litigation, Cisco and Alcatel-Lucent argued, and this Court agreed, that the release unambiguously extends also to Fujitsu's "customers," including companies that use licensed Fujitsu components in their products. The Federal Circuit affirmed that judgment. Defendants in this case incorporate licensed Fujitsu DSPs into certain of their accused products and have therefore raised a materially identical license and release defense under the OFA. Because there is no basis to distinguish the Court's prior ruling, and Oyster admits as much, summary judgment should be granted on Defendants' release defense.

The Court should also grant summary judgment of patent exhaustion as to the products containing DSPs licensed under the OFA. There is no genuine dispute that the DSPs substantially embody the '500 patent invention under Oyster's infringement theory, which Oyster is bound by. The only allegedly inventive aspect of the '500 patent is the ability to switch between different modulation modes (phase and amplitude modulation), and there is no dispute that the licensed Fujitsu DSPs provide the functionality alleged to meet this claim requirement. Oyster has not presented any contrary facts; its expert's rebuttal testimony instead rests wholly on a misreading of the law of exhaustion. Finally, Oyster's suggestion that there is a reasonable and intended noninfringing use of the licensed Fujitsu DSPs despite its broad infringement theory is contradicted by both the evidence and its own expert's opinions. In sum, there is no triable issue of fact on exhaustion and the issue boils down to a pure question of law warranting summary judgment.

II.     **STATEMENT OF THE ISSUES**

1. Did Oyster release all claims of infringement as to Defendants' accused products that contain DSPs supplied by Fujitsu?

2. Did sales of Fujitsu DSPs under the OFA for use in Defendants' products exhaust Oyster's

patent rights where the DSPs practice the allegedly inventive feature of the claims?

### III. STATEMENT OF UNDISPUTED MATERIAL FACTS

#### A. The Patent-in-Suit

Oyster asserts claims 1, 4, 5, 8, and 16 of U.S. patent No. 6,665,500 ("the '500 patent"), titled "[d]ual-mode fiber optic telecommunications system." [Ex. B.] The '500 patent's sole inventor, Peter Snawerdt, testified that the invention was, "at a very high level, the combination of amplitude modulation and phase modulation and the ability to switch between those functions." [Ex. C at 37:7-14; *see also* Ex. D ¶214.] The patent describes switching between phase- and amplitude-modulated modes by using a controller including a switch. [Ex. B, 2:34-41, 2:47-3:34.] This aspect of the invention is reflected in all asserted claims, which require both phase- and amplitude-modulated modes, and that the modes occur at different times. [*Id.*, cls. 1, 16.]

The asserted claims also recite several hardware components. Claim 1 recites "a laser," "a phase modulator," and a "controller" with specific functionality. [*Id.* cl. 1.] Dependent claims 4 and 5 add that the controller has "a switch for switching between . . . modes." [*Id.* cls. 4-5.] Claim 16 recites a "transmitter" with a "laser" and "a controller for switching an output of the laser between" modes. [*Id.* cl. 16.] Claim 16 further requires "an optical fiber connected to the transmitter" and "a receiver having an interferometer being connected to the optical fiber." [*Id.*]

The '500 patent itself states, however, that most of these components were used "[i]n current fiber optic networks" before the invention. [*Id.*, 1:12-28; Ex. E ¶204.] For example, the patent states that existing networks employed a "laser amplitude modulator and laser" that "define a transmitter for transmitting the optical signal over an optical fiber, which is then received by a receiver." [Ex. B, 1:12-20.] Mr. Snawerdt also testified that there were interferometers and phase-modulated systems before the invention, and that such systems included controllers for controlling the phase modulators. [Ex. C at 25:17-26:1, 30:2-9; Ex. E ¶¶89-91.]

B.  The Oyster-Fujitsu Agreement

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████

C.  Prior Litigation Regarding the OFA

The Court has previously applied the OFA in connection with Oyster's litigation against Cisco and Alcatel-Lucent. [*See* Ex. F.] In that litigation, the Court concluded that the OFA released Oyster's claims against Cisco and Alcatel-Lucent products incorporating Fujitsu-sourced modulators and receivers. [*Id.* at 4-5, 7-17.] The Court rejected Oyster's argument that a ███ ████████" clause in the OFA's definition of "Licensed Products" prevented the OFA from releasing Oyster's claims against Cisco and Alcatel products incorporating Fujitsu components prior to the agreement's effective date. [*Id.* at 8-12.] The Court also held that Oyster's claims were released even under Oyster's interpretation of the OFA because "Oyster's litigating positions, contentions, and representations in the Fujitsu litigation which preceded the OFA" showed that the Fujitsu components "embodied the essential features of the patented invention and therefore meet the limitation Oyster argue[d] should be read into the release." [*Id.* at 12-17.]

Oyster appealed and the Federal Circuit affirmed. *Oyster Optics, LLC v. Alcatel-Lucent*

*USA, Inc.*, 816 F. App'x 438 (Fed. Cir. 2020). The Court of Appeals "express[ed] no view with respect to" whether the ▮▮▮▮▮▮▮▮" clause limited the release, upholding this Court's ruling that Oyster's litigating positions and infringement contentions established that the Fujitsu modulators and receivers substantially embodied the relevant patent claims. *Id.* at 445-47.

### D. Defendants' Relevant Products and Oyster's Contentions

Oyster accuses certain products capable of transmitting optical signals both in an alleged "phase-shift keying (PSK) mode" and "in a quadrature amplitude modulation (QAM) mode." [Ex. G ¶¶99, 125-134.] Certain of Defendants' accused products incorporate ▮▮▮▮ digital signal processor ASICs ("DSPs"), which Defendants source from ▮▮▮▮▮▮▮▮▮▮ [Ex. E ¶201.] The ▮▮▮▮ DSPs control these products' modulators, including the ability to support and switch between the alleged PSK and QAM modes. [*Id.* ¶¶206-208; Ex. H at 182:20-183:1.] The ▮▮▮▮ DSPs are manufactured by and supplied to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [Ex. E ¶201; Ex. I ¶¶3-10.] ▮▮▮▮ is an "Affiliate" of ▮▮▮▮▮▮ under the OFA. [Ex. A ¶1.1; Ex. J] Because Defendants indirectly source the ▮▮▮ DSPs from ▮▮▮ Defendants are "customers" of Fujitsu under the OFA. [Ex. A ¶¶1.3, 3.1; Ex. F at 4-5.] The ▮▮▮▮ DSPs are "Licensed Products" under the OFA because they (1) are at least either "products," "components," and/or "hardware"; (2) were "made, sold, . . . or distributed" by ▮▮▮▮, an "Affiliate" under the OFA; and (3) were "sold to, distributed to, or otherwise provided (directly or indirectly) to any customer by" ▮▮▮▮ [Ex. A ¶3.1; Ex. F at 10-11.] As "customers" of Fujitsu's Licensed Products, the OFA's release provision applies directly to Defendants. [Ex. A ¶3.1.]

Jeff Ronaldi, Oyster's 30(b)(6) witness regarding the OFA and its related contentions, testified that Oyster is not aware of any factual distinction that would justify treating Defendants' products incorporating Fujitsu components differently from the Cisco and Alcatel-Lucent products this Court found to be released under the OFA. [Ex. K at 57:21-58:7.]

## IV. LEGAL STANDARDS

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute is genuine only if "a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

"[A]ll or part of the right to exclude may be waived by granting a license, which may be express or implied." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995). Texas law governs the OFA's interpretation. [Ex. A ¶9.] Texas courts determine whether a contract is ambiguous as a question of law, *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 518 (Tex. 1995), and if there is no ambiguity in a contract "its construction and meaning become a question of law for the court to determine." *Dedier v. Grossman*, 454 S.W.2d 231, 234 (Tex. App. 1970). Texas courts determine this meaning by looking to the four corners of the contract, ascertaining the parties' intent from the instrument as a whole. *E.g.*, *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (per curiam).

Patent exhaustion is a doctrine separate and distinct from a license or release defense. *See, e.g.*, *Realtime Data, LLC v. T-Mobile USA, Inc.*, 936 F. Supp. 2d 795 (E.D. Tex. 2013). It reflects the long-established principle that "a machine carries with it the right to the use of that machine to the full extent to which it can be used." *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 455 (1873); *see also LifeScan Scotland Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1376-77 (Fed. Cir. 2013). The doctrine "provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc. v. LG Elecs., Inc.*, 533 U.S. 617, 625 (2008). "[T]he critical

issue" in determining whether the authorized sale of a product exhausts the patentee's rights "is whether the product 'substantially embodies the patent'—i.e., whether the additional steps needed to complete the invention from the product are themselves 'inventive' or 'noninventive.'" *LifeScan*, 734 F.3d at 1368 (quoting *Quanta*, 553 U.S. at 633-34).

V. **ARGUMENT**

    A. **The OFA's Release Bars Oyster's Claims Against Products Incorporating ▉ DSPs Prior to Its Effective Date**

        1. **The Court's Conclusion in the Prior Litigation Is Dispositive**

The Court's prior holding that the OFA's release applied to Cisco and Alcatel-Lucent Products incorporating Fujitsu components compels the conclusion that the release also applies to Defendants' similarly situated products. [Ex. F.] The '500 patent, like the patents at issue in that case, is a "Licensed Patent" under the OFA because Oyster owned it as of the OFA's effective date. [*Id.* at 4-5; Ex. A ¶1.2.] ▉, like Fujitsu Optical, is an "Affiliate" of the Fujitsu parties to the OFA. [Ex. A ¶1.1; Ex. F at 4-5; Ex. J.] The ▉ DSPs, like the receivers and modulators at issue in the prior case, are "Licensed Products" under the OFA because they (1) are at least either "products," "components," and/or "hardware"; (2) were "made, sold, . . . or distributed" by ▉, an "Affiliate" under the OFA; and (3) were "sold to, distributed to, or otherwise provided (directly or indirectly) to any customer by" ▉ [Ex. A ¶3.1; Ex. F at 10-11.] Defendants, like Cisco and Alcatel-Lucent, are "customers" under the OFA because they source the relevant components, at least indirectly, from Fujitsu. [Ex. A ¶¶1.3, 3.1; Ex. F at 5, 8.] The release thus applies to Defendants like it applied to Cisco and Alcatel-Lucent. [Ex. A ¶3.1; Ex. F at 11-12.] It is thus unsurprising that Mr. Ronaldi admitted that Oyster lacks any factual basis to distinguish this case from the Court's prior holding. [Ex. K at 57:21-58:7.]

    Oyster cannot relitigate its prior assertion that the OFA's release was limited by the "▉

███████" clause within the OFA's "Licensed Products" definition. That precise issue was litigated and decided against Oyster in the Court's prior ruling, so collateral estoppel precludes Oyster from rearguing the same issue here. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005) (*en banc*). Oyster cannot evade the preclusive effect of this Court's prior judgment by arguing that its findings were not necessary because the Federal Circuit affirmed on an alternate ground. Although alternate grounds may provide a basis for avoiding preclusion on the basis of "***offensive*** collateral estoppel," *see Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 391-94 (5th Cir. 1998), the Fifth Circuit has never extended that exception to ***defensive*** collateral estoppel. Moreover, every district court in this Circuit to confront the question has followed "the majority of Circuits," which "routinely give alternative ***defensive*** collateral estoppel effect in furtherance of judicial economy and as a matter of fairness and common sense." *Porter v. Farris*, No. 1:06CV293-SA-JAD, 2008 WL 3842905, at *4-*5 (N.D. Miss. Aug. 13, 2008) (collecting cases); *see also Adaptix, Inc. v. AT&T Mobility LLC*, Nos. 6:12-cv-17, 6:12-cv-20, 6:12-cv-120, 2015 WL 12696219, at *3 (E.D. Tex. Sept. 29, 2015). Here, Defendants are asserting collateral estoppel against the plaintiff, Oyster. Thus, this case involves defensive—not offensive—collateral estoppel. *See, e.g.*, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979).

Oyster has no basis to urge a different result even if preclusion did not attach. Interpretation of the OFA's unambiguous language is a question of law, *Dedier*, 454 S.W.2d at 234, and Oyster admits there are no factual distinctions here in any event. [Ex. K at 57:21-58:7.] Thus, the Court should grant summary judgment in favor of Defendants' release defense under the OFA.

### 2. The Release Applies Even under Oyster's Reading of the OFA

The release applies even if Oyster could relitigate the OFA's meaning and obtain a different result. As the Court found, the "███████████" clause "merely articulates the law of patent exhaustion." [Ex. F at 9; Ex. A ¶1.3.] As discussed in §B, *infra*, no reasonable jury could find that

Fujitsu's authorized sales of the ▮ DSPs did not exhaust Oyster's rights under the '500 patent. The same facts also establish that the release applies even under Oyster's reading of the OFA.

### B. Patent Exhaustion Bars Oyster's Claims against Products with ▮ DSPs

#### 1. Oyster's Arguments against Substantial Embodiment Are Meritless

As discussed above, the test for whether a product "substantially embodies" a patented invention is "whether the additional steps needed to complete the invention from the product are themselves 'inventive' or 'noninventive.'" *LifeScan*, 734 F.3d at 1368 (quoting *Quanta*, 553 U.S. at 633-34); *see also Quanta*, 553 U.S. 617, 633 ("Here, as in *Univis*, the incomplete article substantially embodies the patent because the only step necessary to practice the patent is the application of common processes or the addition of standard parts."). The key inquiry here is whether the ▮ DSPs "substantially embody" the '500 patented invention. The answer is an unequivocal affirmative for several reasons.

First, an examination of the patent claims reveals that the allegedly inventive aspect of the '500 patent claims is found in the ▮ DSPs. As explained by Dr. Paul Prucnal, a Professor of Electrical Engineering at Princeton University, the only purportedly inventive element of the '500 patent claims is "the ability of the transmitter to switch between" amplitude- and phase-modulated modes. [Ex. E ¶¶8, 205.] The inventor, Mr. Snawerdt, and Dr. Goossen both adopted a materially identical description of the invention. [Ex. C at 37:7-14; Ex. D ¶214.] Oyster's expert Dr. Goossen criticizes Dr. Prucnal's exhaustion analysis for "ignor[ing] almost all of the aspects of the claims," such as "the laser, controller, phase and amplitude modulator, or the interferometer." [Ex. D ¶209.] This criticism, however, is rooted in a misunderstanding of the correct legal standard. Specifically, Dr. Goossen suggests that it does not matter whether "these portions of the claims are 'inventive'" as long as they "are necessary to practice the claims." [*Id.*] Dr. Goossen is simply misinformed about the law. As the Federal Circuit has explained, whether these "additional [components]

needed to complete the invention . . . are "'inventive' or 'noninventive'" is the "critical issue" in analyzing "substantial embodiment" for exhaustion. *LifeScan*, 734 F.3d at 1368. Under Dr. Goossen's standard, there would have been no exhaustion in *Quanta* because additional memory and buses not included in the microprocessors at issue were "necessary to practice" the relevant patent claims. *See* 553 U.S. at 633-34. The law does not allow trivial variations to defeat exhaustion; otherwise, patentees could demand new licenses with each irrelevant addition to licensed products.

Under the correct standard, the ▓▓▓▓ DSPs need not include the common components of prior art optical communications systems such as a laser, controller, phase modulator, amplitude modulator, or interferometer to substantially embody the '500 patent. As an initial matter, the broadest '500 patent claims do not recite an amplitude modulator or interferometer. [*E.g.*, Ex. B at cl. 1.] Because the Federal Circuit has rejected the view "that patent exhaustion must be adjudicated on a claim-by-claim basis," exhaustion of claim 1 results in "the exhaustion of the patent[]" in its "entirety." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013). Thus, amplitude modulators or interferometers are not relevant to the exhaustion inquiry—though the undisputed evidence establishes that these elements are "noninventive" in any event. [*See, e.g.*, Ex. E ¶¶ 88-91, 126-127, 204-205; Ex. B, 1:11-2:24; Ex. C at 25:17-26:1, 28:14-17, 30:2-9.]

Dr. Prucnal's unrebutted analysis, Mr. Snawerdt's admissions, and the '500 patent itself establish that the remaining claim elements—a laser, controller, and phase modulator—were not inventive. The '500 patent, for instance, states that using a laser was already "typical[]" in "current fiber optic networks" at the time of the invention. [Ex. B, 1:11-20; *see also* Ex. E ¶88-89, 91, 204.] Mr. Snawerdt agreed that "phase modulators were commercially available before [his] invention," and that prior art systems had controllers that controlled their phase modulators. [Ex. C, 28:11-13, 30:2-9; Ex. E ¶¶89-91.] The '500 patent's background section also concedes that prior art patents

included such systems. [Ex. B, 1:46-67, 2:8-19.] Dr. Prucnal identified several other examples of prior art patents disclosing phase modulators with controllers. [*E.g.*, Ex. E ¶¶104-109, 119-120, 126-128.] Dr. Goossen does not rebut any of this evidence or even argue that using lasers, controllers, or phase modulators was "inventive." [*See* Ex. D ¶¶205-211.] Thus, these elements are materially indistinguishable from the "noninventive" components in *Quanta*, and they thus cannot preclude the ▮▮▮ DSPs from substantially embodying the patent. *See* 553 U.S. at 633-34.

Simply put, the allegedly inventive aspect of the '500 patent is capability to switch between amplitude- and phase-modulated modes, [Ex. E ¶¶202-205; Ex. C at 37:7-14; Ex. D ¶214], and the experts agree that the ▮▮▮ DSPs implement the accused amplitude- and phase-modulated modes (*i.e.*, PSK and QAM) and the ability to switch between these modes. [Ex. E ¶¶206-208; Ex. H at 182:20-183:1; *see also* Ex. G ¶¶218, 221 (Dr. Goossen mapping the mode limitations to PSK and QAM formats).] There is simply nothing else that any party, the inventor, or any expert has pointed to as inventive. The substantial embodiment must therefore focus on the ability of a product to switch between amplitude- and phase-modulated modes. *See LifeScan*, 734 F.3d at 1368-73.

Oyster's own infringement contentions further rebut its argument against substantial embodiment. Like Dr. Goossen, Oyster's contentions unequivocally rely on the accused amplitude- and phase-modulated modes (*i.e.*, PSK and QAM) of the accused products, [Ex. L at 15-24; 29-42] and it is undisputed that the ▮▮▮ DSPs control switching between these accused modes. [Ex. E ¶¶206-208; Ex. H at 182:20-183:1.] Having mapped the allegedly-inventive aspect of the claims to functionality performed by the ▮▮▮ DSPs, Oyster cannot now argue that the DSPs do not substantially embody its claims. *See Keurig*, 732 F.3d at 1374; *High Point Sarl v. T-Mobile USA, Inc.*, 640 F. App'x 917, 929-30 (Fed. Cir. 2016) ("T-Mobile persuasively established that, in view of High Point's own infringement contentions, the accused [products] substantially

embodied every purportedly inventive element of the claimed invention.").

Nor can Oyster avoid the binding effect of its own contentions by having Dr. Goossen map the claimed "controller" to an "███████" or "███████" rather than to the products' DSPs identified in Oyster's contentions. [Ex. G ¶¶158, 211-216.] Despite this improper shift in Oyster's infringement read, the fact remains that switching between modes—not just controlling the phase modulator—is the allegedly inventive aspect of the '500 patent. [Ex. C at 37:7-14; Ex. D ¶214; Ex. E ¶¶8, 205.] And it is also undisputed that the ███ DSPs are responsible for switching between the alleged phase- and amplitude-modulated modes in the accused products. [Ex. E ¶¶206-208; Ex. H at 182:20-183:1.] This shift in Oyster's infringement read does not allow it to escape exhaustion.

Finally, Oyster may contest substantial embodiment because Defendants dispute whether the alleged phase-modulated mode in the accused products meets the Court's construction of "phase modulate." Any such argument fails, because Oyster is bound by its infringement allegations, which plainly state that the alleged PSK mode meets the phase modulation limitation of the claims. [Ex. L at 17-24, 29-42; Ex. G ¶¶218, 221]; *see also Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366-67 (Fed. Cir. 2000) (holding patentee bound by infringement allegations for purposes of establishing that prior art product practiced the patent); *High Point*, 640 F. App'x at 929-30. Indeed, this Court held that Oyster was bound to its infringement allegations against Fujitsu in the prior litigation against Cisco and Alcatel-Lucent, [Ex. F at 12-17], and the Federal Circuit affirmed that holding on appeal, *Oyster*, 816 F. App'x at 445-46. Oyster therefore cannot create a triable issue of fact on exhaustion by invoking Defendants' non-infringement position. Indeed, if Oyster concedes that the accused ███ DSPs do not infringe, then summary judgment for Defendants is appropriate for that reason.

> **2. Dr. Goossen's Opinion Regarding an Alleged Noninfringing Use for the ███ DSPs Is Unavailing**

In a final bid to avoid this straightforward application of patent exhaustion, Oyster, through Dr. Goossen, asserts that the ▆▆ DPSs "do[] not meet the 'only reasonable and intended use' prong of the exhaustion test" because "the ▆▆ DSP could be used in product hardware . . . and software no (sic) capable of performing both types of modulation." [Ex. D ¶212.] However, "alternative uses are relevant to the exhaustion inquiry under *Quanta* only if they are both 'reasonable and intended' by the patentee or its authorized licensee." *LifeScan*, 734 F.3d at 1369. There is no evidence that ▆▆ DSPs are intended to be used with systems that are incapable of supporting both phase- and amplitude- modulation and switching between them. Moreover, Dr. Goossen performs no analysis suggesting that using ▆▆ DSPs with hardware or software incapable of supporting both phase- and amplitude- modulation is "reasonable." [Ex. D ¶212.]

Indeed, the very testimony cited by Dr. Goossen rebuts any conclusion that his hypothetical noninfringing use is "reasonable" or "intended" by Fujitsu. [*See id.*] Specifically, Infinera engineer Bernhard Spinnler testified that "normally you wouldn't do that, because it's not cost efficient" and because it would interfere with the ability to test the products. [Ex. M at 39:9-41:5.] Indeed, Dr. Goossen fatally undermines his own opinion on this issue in the very next paragraph of his expert report, asserting that it would **not** be "commercially **reasonable**" to provide products without both phase- and amplitude-modulated modes because "it would strip all the benefits of providing both forms of modulation from the products." [Ex. D ¶213.] Accordingly, Dr. Goossen's opinions provide no basis to conclude that the ▆▆ DSPs have "***reasonable and intended***" noninfringing uses, as the law requires. *LifeScan*, 734 F.3d at 1369.

## VI. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant partial summary judgment upholding Defendants' release and patent exhaustion defenses under the OFA.

Dated: September 28, 2020

Respectfully submitted,

By: *Joseph V. Colaianni*

Ruffin Cordell
Bar No. 04820550
cordell@fr.com
Indranil Mukerji
MA Bar No. 644059
mukerji@fr.com
Joseph V. Colaianni
D.C. Bar No. 454744
colaianni@fr.com
Christopher Dryer
D.C. Bar No. 1022460
dryer@fr.com
Jack R. Wilson
VA Bar No. 91178
jwilson@fr.com
**FISH & RICHARDSON P.C.**
1000 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

Melissa R. Smith
SBN 24001351
**Gillam & Smith LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: 903-934-8450
Fax: 903-934-9257
melissa@gillamsmithlaw.com

*Counsel for Defendants Infinera Corporation, Coriant (USA) Inc., Coriant North America, LLC and Coriant Operations, Inc.*



**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on September 28, 2020, via electronic mail to counsel of record for Plaintiff.

*/s/ Melissa R. Smith*