IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| OYSTER OPTICS, LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:19-CV-00257-JRG |
| | § | |
| INFINERA CORPORATION,  CORIANT | § | |
| NORTH AMERICA, LLC,  CORIANT | § | |
| OPERATIONS, INC., CORIANT (USA) | § | |
| INC., | § | |
| | § | |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are cross-motions for summary judgment filed by Plaintiff Oyster Optics, LLC ("Oyster's MSJ") (Dkt. No. 104) and Defendants Infinera Corp., Coriant North America, Coriant Operations, and Coriant (USA) Inc. ("Defendants' MSJ") (Dkt. No. 110) (together, the "Cross MSJs"). After careful consideration of the briefing (Dkt. Nos. 104, 110, 134, 146, 165, 175, 185, 191) and the arguments presented at the February 11, 2021 hearing (*see* Dkt. No. 240), and for the reasons stated herein, the Court concludes that Oyster's MSJ should be **GRANTED** and Defendants' MSJ should be **DENIED**.

## I.    INTRODUCTION

Plaintiff Oyster Optics, LLC ("Oyster") sued Defendants Infinera Corp. ("Infinera"), Coriant North America, Coriant Operations, and Coriant (USA) Inc. (collectively, "Coriant") (together with Infinera, "Defendants"), alleging infringement of U.S. Patent No. 6,665,500 (the "'500 Patent" or the "Asserted Patent"). (Complaint, Dkt. No. 1). In each of the Cross MSJs, the Court is asked to answer the same two questions. First, the Court is asked to determine whether Defendants have an express license to the '500 Patent under a 2018 Settlement and License

Agreement between Oyster and Coriant (the "Oyster-Coriant Agreement" or "OCA", (Dkt. No. 104-2)). (Dkt. No. 104 at 2; Dkt. No. 110 at 2). Second, if there is no express license under the OCA, the Court is asked to determine whether Defendants nonetheless have an implied license to the '500 Patent. (Dkt. No. 104 at 2; Dkt. No. 110 at 2). The parties agree that there are no contested issues of fact, and ask the Court to answer these questions as a matter of law. (*See* Proposed Joint Pretrial Order ("JPTO"), Dkt. No. 220, at 14–15, 17–18). After considering the uncontested facts and the relevant legal authorities, the Court concludes that the '500 Patent is neither expressly licensed nor impliedly licensed to Defendants under the OCA.

## II.    BACKGROUND

### A.    The Prior Litigation

The following facts are uncontested. Oyster sued Coriant, Infinera, and others for patent infringement in 2016 and 2018. *See Oyster Optics, LLC v. Infinera Corp.*, No. 2:18-cv-206, 2019 WL 2603173, at *1 (E.D. Tex. June 25, 2019). Oyster and Coriant settled their claims in June of 2018. *Id.* As a result of that settlement, Oyster and Coriant entered into a Settlement and License Agreement (the OCA). *Id.* The OCA granted to Coriant and its "Affiliates" a "royalty-free, irrevocable, perpetual, and fully paid-up license" to the "Licensed Patents," (OCA § 4.1), and released Coriant and its "Affiliates" from "any and all claims . . . based on the Licensed Patents" that "aris[e] from activities" in the United States "up to" and "prior to" June 27, 2018, (OCA § 3.1). The OCA defines "Affiliate" as "any Person, now or in the future, which ... (ii) has Control of a Party hereto." (OCA § 1.1). "Control" means "that fifty percent (50%) or more of the controlled entity's shares or ownership interest representing the right to make decisions for such entity are owned or controlled, directly or indirectly, by the controlling entity." (OCA § 1.1).

2

In October of 2018, Infinera acquired Coriant. (JPTO at 15). Infinera then moved for summary judgment against Oyster's claims. *Oyster*, 2019 WL 2603173, at *1. By virtue of the acquisition, Infinera reasoned that it now had "Control" over Coriant, and therefore was an "Affiliate" of Coriant. *Id.* The Court agreed with Infinera. Construing the OCA under New York contract law, the Court concluded that Infinera was indeed an "Affiliate" of Coriant, and that Infinera had a license to the "Licensed Patents," which included the patents asserted in that suit. *Id.* at *4–5. The Court granted summary judgment. *Id.* at 11. On February 11, 2021, the Federal Circuit affirmed this Court's construction of the OCA and grant of summary judgment. *Oyster Optics, LLC v. Infinera Corp.*, No. 2019-2179, 2021 WL 509665 (Fed. Cir. Feb. 11, 2021).

### B.    This Dispute

At issue here is the scope of the term "Licensed Patents" as used in the OCA. In relevant part, the OCA defines "Licensed Patents" as follows:

> "Licensed Patents" means: (i) the Patents-in-Suit (including without limitation all applications therefor); and (ii) any and all classes and types of related U.S. patents, U.S. patent applications and U.S. patent rights including without limitation all divisions, continuations, continuations-in-part, reissues and reexaminations or extensions of such patents and patent applications. Notwithstanding the foregoing, Licensed Patents include, without limitation, the patents and applications set forth in Appendix B.

(OCA § 1.3). The "Patents-in-Suit" are defined as including "U.S. Patent Nos. 6,594,055; 6,469,816; 6,476,952; 7,099,592; 8,913,898; 7,620,327; 8,374,511; and 9,363,012." (OCA pmbl. ¶ 2). Appendix B to the OCA lists those eight patents plus a ninth, U.S. Patent No. 9,749,040. Under the Court's prior summary judgment order, Defendants have a license to each of these patents and any other "Licensed Patents" under the OCA.

It is not disputed that the '500 Patent, the only patent asserted in the instant suit, is not listed in the definition of "Patents-in-Suit," in Appendix B, or anywhere else in the OCA. It is also

not disputed that the '500 Patent does not share a priority relationship with any of the listed "Patents-in-Suit." It is not a division, continuation, continuation-in-part, reissue, reexamination, or extension of any of those patents. Defendants contend, however, that the meaning of the term "related U.S. patents" in the OCA is broad enough to encompass the '500 Patent, making it a "Licensed Patent," and thus barring Oyster's instant patent infringement claims. (Dkt. No. 110 at 1). In the alternative, Defendants argue that the equitable doctrine of implied license applies with the same result.

## III.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties agree that there are no contested issues of fact and ask the Court to rule on both issues as a matter of law. (Dkt. No. 220 at 17–19).

Defendants' express license and release defense bears on interpretation of the OCA. It is not disputed that the construction of the OCA is governed by New York law. (*See* OCA § 9); *see also Oyster*, 2019 WL 2603173, at *2. Contract interpretation is a question of law and may be appropriately resolved by summary judgment. *See Adirondack Transit Lines, Inc. v. United Transp. Union*, 305 F.3d 82, 85 (2d. Cir. 2002) (applying New York contract law); *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 404 (N.Y. 2009). Whether an implied license exists is also a question of law. *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997); *Met-Coil Sys. Corp. v. Korners Unlimited., Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986). As the parties agree that the Cross MSJs only present questions of law, both questions are susceptible to resolution on motion for summary judgment.

## B.      Contract Interpretation

Under New York law, a contract must be construed in accordance with the parties' intent. *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013). The best evidence of the parties' intent is what is written in the contract. *Id.* Thus, a written agreement that is complete, clear, and unambiguous must be enforced according to the plain meaning of its terms. *Id.* A court may only look beyond the four corners of a document if it finds an ambiguity in the contract terms. *Id.*

Whether a contract is ambiguous is a question of law. *Riverside*, 920 N.E.2d at 404. To determine whether a contract is ambiguous, a court must look at the whole of the contract's four corners, but not beyond. *Id.* "Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought." *Id.* (quoting *Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418 (N.Y. 1927)). A contract is ambiguous if, when read as a whole, it fails to disclose its purpose or the parties intent, or when a term is susceptible to two reasonable interpretations. *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014). When words used in a contract have a precise, definite, and well-understood meaning in the law, they must be given that meaning unless the context of the contract indicates otherwise. *See Nau v. Vulcan Rail & Constr. Co.*, 36 N.E.2d 106, 111 (N.Y. 1941).

The parol evidence rule, which bars the use of extrinsic evidence to vary the terms of a contract, applies with full force when a contract contains a merger clause. *Riverside*, 920 N.E.2d at 404.

### C.      Express License and Release

"A patent grants its owner the right to exclude others from making, using, or selling the patented invention. However, all or part of the right to exclude may be waived by granting a license, which may be express or implied." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995) (internal citations omitted). "[A] patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee" and "can be written to convey different scopes of promises not to sue, *e.g.*, a promise not to sue under a specific patent, or more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future." *Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed. Cir. 1987).

Similarly, a patent owner may, by agreement, promise not to assert claims based on conduct that arose at a particular time and place. Such promises are known as "releases" from liability. *See, e.g.*, *Dinesol Bldg. Prod., Ltd. v. Tapco Int'l, Inc.*, 201 F. App'x 764, 766 (Fed. Cir. 2006) (determining "whether the Settlement Agreement released Dinesol from claims that its custom plastic shutters infringe Tapco's shutter patents").

Generally, licenses apply prospectively and releases apply retroactively. *See, e.g.*, *Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 345 (Fed. Cir. 1997) (explaining that "the license grants full protection against a claim of future infringement" and that to deprive another from "the right to sue for past damages for past infringement" "would require a release, not a license"); *Murray-Gardner Mgt. v. Iroquois Gas Transmission Sys.*, 646 N.Y.S.2d 418, 419 (App. Div. 3d Dep't 1996) ("Another applicable principle is that releases bar suits on causes of action arising on or prior to the date of their execution but will not bar subsequent claims unless they are specifically embraced within the release or fall within the fair import of its terms."). However, any such

limitations are a matter of contract interpretation under the governing law. *See e.g.*, *Realtime Data, LLC v. T-Mobile USA, Inc.*, 936 F. Supp. 2d 795, 801–04 (E.D. Tex. 2013) (interpreting license and release provisions under New York law).

### D.     Implied License

Implied license is a defense that derives from principles of legal estoppel. *Cheetah Omni LLC v. AT&T Servs., Inc.*, 949 F.3d 691, 695–96 (Fed. Cir. 2020). When a licensor has granted a definable license right in exchange for valuable consideration, legal estoppel prevents the licensor from derogating the licensee's rights. *Id.*; *AMP Inc. v. United States*, 389 F.2d 448, 452 (Ct. Cl. 1968). The Federal Circuit has interpreted legal estoppel to provide an implied license to practice a patent that is "broader than, and necessary to practice" an expressly licensed patent. *TransCore, L.P. v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1278 (Fed. Cir. 2009). Continuations of an expressly licensed patent are presumptively impliedly licensed "absent a clear indication of mutual intent to the contrary" in the license contract. *General Protecht Grp. Inc. v. Leviton Mfg. Co., Inc.*, 651 F.3d 1355, 1362 (Fed. Cir. 2011). The implied license is presumed in that case because "by definition, . . . continuations can claim no new invention not already supported in the earlier issued patents." *Id.* at 1361.

## IV.     DISCUSSION

### A.     Express License

The express license issue centers on the scope and meaning of "Licensed Patents" under the OCA. The OCA grants to Coriant and its Affiliates (such as Infinera) a license to the "Patents-in-Suit" and "any and all classes and types of *related U.S. patents*[.]" (OCA § 1.3 (emphasis added)). The parties dispute the meaning of the term "related U.S. patents." Oyster and Defendants

both contend this term is unambiguous; yet, each ascribes to it a different meaning and the parties arrive at opposite results.

Defendants argue that the '500 Patent is "related" to at least some of the OCA's "Patents-in-Suit," namely the '055, '592, and '327 patents, in the sense that they "arose out of the same work performed at the same time." (Dkt. No. 110 at 7). They argue that these patents are all "related" because they share the same sole inventor, same general subject matter, and have application filing dates "just days apart." (*Id.*). According to Defendants, the '500 Patent and the listed '055, '592, and '327 patents all derive from "[Inventor Peter] Snawerdt's late 2000 through mid-2002 attempts to devise a solution to preventing fiber optic cables from being tapped." (*Id.*).[1]

Oyster contends that the term "related U.S. patents" under the OCA is limited to those patents that share a formal priority relationship with the OCA's "Patents-in-Suit." Oyster argues that this must be the case because "related" is a legal term in patent law that refers to patents and applications that belong to a common priority family.[2] Oyster cites both to provisions of the Manual of Patent Examining Procedure (MPEP) and to Federal Circuit cases where "related" is given this meaning. *E.g.*, MPEP § 215; *Regents of the Univ. of N.M. v. Knight*, 321 F.3d 1111 (Fed. Cir. 2003) *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306, 1312 (Fed. Cir. 2007); *Cheetah Omni*, 949 F.3d at 695–96.

---

[1] Oyster urges the Court to reject Defendants' body-of-work argument based on a representation that Defendants made in the prior litigation. In the 2016 litigation, Infinera filed a *Daubert* motion in which it argued that a license for the '500 Patent was not comparable to the OCA's "Patents-In-Suit" because the '500 Patent is "totally different" from the '050 Patent and "is not: (a) a patent-in-suit; (b) a family member to any patent-in-suit; or (c) subject to the same terminal disclaimer as each of the patents-in-suit." (Dkt. No. 104 at 9 (quoting Case No. 2:16-cv-1302, Dkt. No. 257 at 8)).

[2] Oyster also notes that dictionary definitions of the term "related" describe familial relation. Oyster cites *Dictionary.com*, which defines "related" as "1. Associated; connected. 2. Allied by nature, origin, kinship, marriage, etc." (Dkt. No. 165 at 2). Oyster also cites *Webster's Dictionary On-Line*, "which defines "related" as "[a]llied by kindred; connected by blood or alliance, particularly by consanguinity." As patents sharing priority relationships are deemed to compose a patent "family," Oyster argue the term "related" in the OCA must mean patents in a patent family. (*Id.* at 3).

Defendants respond that the word "related" in the OCA is used "as the word is used in ordinary English speech" rather than under a technical patent prosecution meaning, which Defendants contend is "trade usage." (Dkt. No. 175 at 2–3). Defendants argue that a facially unambiguous contract cannot be assailed with trade usage and, in any event, trade usage requires a showing that the language has a "fixed and invariable" meaning in the "industry in question." (*Id.* (citing *AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 781 N.Y.S.2d 88, 90 (N.Y. App. Div. 2004); *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010))). Defendants contend that Oyster has established neither that the OCA is ambiguous nor that "related" as the "fixed and invariable" meaning Oyster argues it has. (*Id.* at 3).

Defendants also argue that Oyster's construction ignores the words "including without limitation." (Dkt. No. 110 at 8). The OCA's definition of Licensed Patents encompasses "any and all classes and types of related U.S. patents . . . *including without limitation* all divisions, continuations, continuations-in-part, reissues and reexaminations or extensions of such patents and patent applications. As the OCA lists every type of priority relationship in Section 1.3, Defendants contend that the words "including without limitation" must mean that there are some "related U.S. patents" *other* than those that share priority relationships with the listed "Patents-in-Suit." (Dkt. No. 110 at 8). To conclude otherwise, Defendants contend, would render these words superfluous. (*Id.*).

After reviewing the OCA, the Court agrees with Oyster that the '500 Patent is not expressly licensed under the OCA's unambiguous language. The evidence within the four corners of the OCA overwhelmingly supports this conclusion.[3] A contract is ambiguous when a term is

---

[3] Both parties also cite to a "Memorandum of Understanding" that preceded the OCA as supporting their position. The OCA contains a merger clause and, as discussed below, is not ambiguous. Therefore, the parol evidence rule bars consideration of a predecessor of the OCA, and the Court ignores such parol evidence.

susceptible to two reasonable interpretations or when the contract as a whole fails to disclose the parties' intent. *Ellington*, 21 N.E.3d at 1003. The term "related U.S. patents," when read in the context of the OCA as a whole, clearly has one reasonable interpretation: patents that that share a priority relationship with the OCA's "Patents-in-Suit." It is clear from the four corners of the OCA that the intent of the drafting parties—Oyster and Coriant—was to settle claims over a limited set of patent families, not to license a broader portfolio of technologies, ideas, or inventive subject matter.

### 1.    The Meaning of "Related" in Patent Law

"Technical words in a contract must be taken in a technical sense unless the context of the instrument or a usage which is applicable clearly indicates a different meaning." *Nau*, 36 N.E.2d at 111. The contract in *Nau* concerned an indemnity clause for expenses and liability stemming from patent "infringement suits." *Id.* at 109. A third party initiated an interference action at the patent office, and the plaintiff successfully defended against the interference. *Id.* at 110. The plaintiff then sued the defendant for indemnity, arguing that the interference action was within the scope of "infringement suits." *Id.* The trial court, after considering much extrinsic evidence, submitted the question to a jury. *Id.* at 110–11. The trial court instructed that "while in the technical sense of the law of patents an interference is an entirely different proceeding from a suit for an infringement of a patent, the sense in which those words were used in the contract was to be determined by [the jury]." *Id.* at 111. This was error according to the Court of Appeals:

> When connected with patents and patent practice, the words and expressions 'infringement,' 'infringement suits,' 'interference' and 'interference proceedings' are words and expressions of art and have a definite, technical and well-understood meaning. Both parties, as plaintiff testified, knew the difference in meaning. The words 'infringement' and 'interference' are not synonymous and an 'interference' proceeding is not an 'infringement suit.'

*Id.* The Court of Appeals noted that the context of the contract did not indicate that the meaning of these legal terms should vary. *Id.* "It is presumed that the contract, prepared by an attorney, was drawn with reference to applicable law." *Id.*

As Oyster notes, "related" has a technical meaning within the parlance of patent law. The use of the term "related" in patent law in each instance of use refers to patents that share a priority relationship. Usage by the Federal Circuit is consistent with this meaning. *E.g.*, *Cheetah Omni*, 949 F.3d at 695–96 ("In *TransCore*, we interpreted legal estoppel to provide an implied license to a *related*, later-issued patent that was broader than and necessary to practice an expressly licensed patent." (emphasis added)); *Endo Pharms. Inc. v. Actavis, Inc.*, 746 F.3d 1371, 1378 (Fed. Cir. 2014) ("The Actavis Agreement . . . contains the same 'continuations, continuations-in-part or divisionals' language . . . . [T]he '482 patent is completely *unrelated* to any of the previously licensed patents, and is likewise not covered by the agreement." (emphasis added)); *Knight*, 321 F.3d at 1115 ("We find the broad language contained in the [agreements] more than sufficient to obligate Scallen and Knight to assign to UNM their . . . inventions and all *related* patents and applications, including the [continuation-in-part] applications." (emphasis added)).

In section 1.77 of the MPEP Patent Rules, which instructs applicants on the contents of a proper patent application, applicants are instructed to "[c]ross-reference to related applications." 37 CFR 1.77(b)(2). Section 1.78, which follows immediately after, makes clear that "related applications" are those which share a priority relationship. That section covers "[c]laiming benefit of earlier filing date and cross-references to other applications" and expressly instructs applicants to make "[c]ross references to other related applications" where appropriate. 37 CFR 1.78(a)(2)(i).

Other sections of the MPEP that are directed to patent examiners also use the term "related" in this sense. In Section 215, which discusses priority claims to foreign applications, the MPEP explains:

> Where the benefit of a foreign filing date based on a foreign application is claimed in a later filed application (i.e., continuation, continuation-in-part, division) or in a reissue application, and a certified copy of the foreign application has been filed in a *parent or related* application, it is not necessary to file an additional certified copy in the later application.

MPEP § 215(III) (emphasis added). In section 2001.06, the MPEP states: "[i]f the application under examination is identified as a *continuation, divisional, or continuation-in-part* of an earlier application, the examiner will consider the prior art properly cited in the earlier application. The examiner must indicate in the first Office action whether the prior art in a *related* earlier application has been reviewed." MPEP § 2001.06(b) (emphases added). There are numerous other examples and each need not be listed here. In each case, context makes clear that the term "related" refers to patent applications that share a priority relationship.

As the *Nau* court observed, contracts must always be referable to the applicable law. There, as here, that law is patent law. The OCA is a patent license that arose out of patent litigation. It was drafted, negotiated, and executed between sophisticated parties represented by experienced patent counsel. Parties should always be able to rely on the certainty afforded by reference to the law that governs the subject matter of the contract. If that were not the case, the value of contracting would be seriously impaired. Oyster's interpretation of the term "related U.S. patents" is therefore the sole reasonable interpretation.

## 2.     The Context of the Disputed Term

The context in which "related U.S. patents" is used confirms that the term is limited to those patents sharing a priority relationship with the Patents-in-Suit. Section 1.3 of the OCA

defines "related U.S. patents" as "including without limitation all divisions, continuations, continuations-in-part, reissues and reexaminations or extensions of such patents." (OCA § 1.3). Each listed relationship is a priority relationship in patent law.

Defendants argue that the language "including without limitation" means that "related U.S. patents" can include relationships other than those listed in the OCA. The Court disagrees. Defendants essentially read "including without limitation" as synonymous with "including but not limited to." Those terms are not synonymous. As used here, "including without limitation" means there are no exceptions. The OCA defines "related U.S. patents" as "including without limitation *all* divisions, continuations, continuations-in-part, reissues and reexaminations or extensions." (OCA § 1.3 (emphasis added)). The effect of that language is to foreclose any argument that a patent sharing a listed priority relationship with a "Patent-in-Suit" is not expressly licensed. Similar language is used in the next sentence: "Licensed Patents *include, without limitation,* the patents and applications set forth in Appendix B." (*Id.* (emphasis added)). As will be discussed below, Appendix B is clearly a closed-ended list.[4] Defendants' interpretation of "related U.S. patents," as including patents that derive from a common body of technical work, is not a reasonable interpretation of "related U.S. patents" as used in OCA.

### 3.      The Intent of the Parties

Reading the OCA as a whole, it is clear that Oyster and Coriant intended to contract for a license to a discrete set of patent families to settle litigation. They did not, as Defendants' interpretation would have it, intend to contract for an open-ended license to a portfolio of technologies, ideas, or inventive subject matter.

---

[4] Even if "related U.S. patents" did somehow encompass more than the listed relationships—all of which are priority relationships—Defendants have not explained how it could encompass something drastically different from a priority relationship.

13

### a.     The OCA is a Settlement License

The preamble, terms, and appendices of the OCA make clear that it is not only a patent license, but a settlement license. The formal title of the OCA is "Settlement and License Agreement." The preamble characterizes the defined "Patents-in-Suit" as patents asserted by Oyster "in litigation pending in the United States District Court for the Eastern District of Texas, Lead Case No. 2:16-cv-01302-JRG-RSP ('Litigation')." (OCA pmbl. ¶ 2). The "Litigation" is referenced throughout the OCA, and section 2 of the OCA required Oyster and Coriant to "cause the Litigation to be dismissed" within seven days of the OCA's "Effective Date." Appendix C to the OCA is a proposed dismissal order. (*Id.* App'x C). Moreover, the license grant is paired with mutual releases from liability. (*Id.* §§ 3.1–3.4). The OCA was intended to bring peace between Oyster and Coriant over a set of patents (and their families) that was being actively litigated at the time. The '500 patent, asserted here, was not part of the "Litigation" settled by the OCA.

It is clear, therefore, that Oyster and Coriant intended the OCA to settle a discrete set of claims over a discrete set of patent families in connection with existing litigation. Oyster and Coriant did not contract for an open-ended license to a portfolio of technologies, ideas, or inventive subject matter, as Defendants' interpretation would have it. Defendants' interpretation would effectively eschew any outer bounds to the license grant. Under Defendants' interpretation, Coriant or its "Affiliates" could at any time attempt to expand the OCA's scope by proffering an expert witness who opines that another patent is technologically related to the OCA's "Patents-in-Suit." Such an interpretation is inconsistent with Oyster's and Coriant's agreement to buy their peace over the "Patents-in-Suit." Defendants' interpretation is not reasonable in light of this straightforward language.

14

### b.      Appendix B

Appendix B also confirms that the OCA was not intended to be an open-ended license. Appendix B lists nine patents. Eight of those patents are the defined "Patents-in-Suit." (OCA App'x B). The ninth patent, U.S. Patent No. 9,749,040, is a continuation of a U.S. Patent No. 9,363,012, which is a "Patent-in-Suit" and is also listed in Appendix B. (*Id.*). The only patent listed in Appendix B that is not a "Patent-in-Suit" shares a priority relationship with a "Patent-in-Suit." In other words, the only patent listed on the face of the OCA that is not a "Patent-in-Suit" is a related U.S. patent.

Notably, it appears from the face of the OCA that Appendix B was initially titled "Representative List of Licensed Patents," but the word "Representative" was crossed out with a pen. (*Id.*). Like each other page of the OCA, Appendix B bears the initials and date "KGC 6/28/18" in the lower right-hand corner. (*Id.*). Presumably, "KGC" is Kenneth G. Craft, the Coriant representative whose name and signature appears three times on the OCA's signature page, also signed on June 28, 2018. (*Id.* at 11). The change from "Representative List of Licensed Patents" to "List of Licensed Patents" in Appendix B, initialed by Kenneth G. Craft contemporaneously with the signing of the OCA itself, is telling. At the time of execution, at least Coriant (and not just its attorneys) understood that the OCA was not intended to be an open-ended license of a technology portfolio—as Defendants (including Coriant) now contend.

### 4.      The '500 Patent Is Not Expressly Licensed

The only reasonable interpretation of the term at issue is that "related U.S. patents" are patents that share a priority relationship with the defined "Patents-in-Suit." This interpretation is consonant with the intent of the parties who executed the OCA. Further, the evidence within the four corners of the OCA overwhelmingly supports this conclusion. The '500 Patent asserted here

is not a "Patent-in-Suit" under the OCA, and it does not share a priority relationship with a "Patent-in-Suit" either. It is therefore not a "related U.S. patent" within the meaning of the OCA. The Court is persuaded that the '500 Patent is not expressly licensed, and Oyster's claims against Defendants for infringement of the '500 Patent are not released. Accordingly, Oyster's MSJ should be **GRANTED** and Defendants' MSJ should be **DENIED** as to express license and release.

###    B.    Implied License

In the alternative, Defendants contend that that Oyster's assertion of the '500 Patent is barred by legal estoppel under the doctrine of implied license. That doctrine prevents a licensor from later derogating a right granted to a licensee in exchange for valuable consideration. *Cheetah Omni*, 949 F.3d at 695–96; *AMP*, 389 F.2d at 452. In *TransCore*, the Federal Circuit found an implied license for an asserted patent that was "broader than, and necessary to practice" an expressly licensed patent. *TransCore*, 563 F.3d at 1278. Defendants contend that is the case here.

Defendants argue that the assertion of the '500 Patent derogates their express license to the '592 Patent, which is a "Patent-in-Suit" under the OCA:

> As explained by Dr. [Paul] Prucnal [Defendants' technical expert], there is no practical way to practice, for example, claim 14 of the '592 patent, without also practicing asserted claim 16 of the '500 patent. Every element of claim 14 of the '592 patent is also in substance required by claim 16 of the '500 patent; both claims require a transmitter with a laser, an optical fiber, a phase modulator, a receiver with an interferometer, and circuitry for switching between a phase-modulated mode and an amplitude modulated mode.

(Dkt. No. 110 at 12 (citations omitted)). Defendants also note that the '592 Patent's specification incorporates the '500 Patent by reference to teach switching between phase and amplitude modulation. (*Id.*).

Oyster responds that implied license typically only extends to "related" patents. (Dkt. No. 138 at 10 (quoting *Cheetah Omni*, 949 F.3d at 696)). Oyster also argues that Defendants' implied

license argument fails because, despite "superficial similarities," there are several differences between the claims of the '500 Patent and the '592 Patent:

> Among other things, the '500 Patent requires a laser for transmitting amplitude-modulated signals, and the '592 Patent has no such requirement. Moreover, the '500 Patent requires an optical fiber to be connected at both the transmitter and receiver, which is not a requirement of the '592 Patent. Finally, the '500 Patent requires a dual-mode transmission system where as the '592 Patent is limited to a card.

(Dkt. No. 138 at 12). Oyster also notes that "phase modulated" as used in the '592 Patent was construed to exclude amplitude modulation, whereas the '500 Patent's construction of this term does not have this restriction. Oyster explains that this difference in construction was due to "critical difference[s]" between the '500 Patent and the patents asserted in the prior litigation. (*Id.*).

A side-by-side comparison of claim 16 of the '500 Patent and claim 14 of the '592 Patent reveals several differences between the two:

| Claim 16 of '500 Patent<br>(Asserted) | Claim 14 of '592 Patent<br>(Licensed) |
|---|---|
| A dual-mode optical transmission system comprising:<br><br>    a transmitter having a laser for transmitting amplitude-modulated signals in a first mode and phase-modulated signals in a second mode and a controller for switching an output of the laser between the first mode and the second mode, the second mode occurring at a different time than the first mode;<br><br>    an optical fiber connected to the transmitter; and<br><br>    a receiver having an interferometer being connected to the optical fiber. | A card for transmitting data over at least one optical fiber, the card comprising:<br><br>    a transmitter having at least one laser and a single phase modulator for phase modulating all of the light from the laser so as to create phase-modulated optical signals in the light as a function of an input electronic data stream;<br><br>    a receiver having an interferometer for reading received optical signals;<br><br>    and a switch for switching between an amplitude-modulated mode and a phase-modulated mode. |

In some respects, claim 14 of the '592 Patent is broader than claim 16 of the '500 Patent. The licensed '592 Patent claims a laser that creates phase-modulated optical signals. The '500

Patent claims a laser that transmits amplitude-modulated signals in a first mode *and* phase-modulated signals in a second mode. While the '592 Patent claims an amplitude-modulated mode and a phase-modulated mode, it is otherwise is silent on what is required in each of these modes. The '592 Patent does not state that the laser must transmit in an amplitude modulated mode, or that the output of the laser is even switched at all. The '592 Patent merely claims two modes. A theoretical device that has a dual-mode receiver and a single-mode transmitter, for example, could practice claim 14 of the '592 Patent but could not literally practice claim of the '500 Patent.

The '500 Patent also requires an optical fiber connected to the transmitter and receiver, but the '592 Patent does not have this requirement. Claim 14 of the '592 Patent only mentions an optical fiber in the preamble.[5]

In one respect, however, claim 16 of the '500 Patent is broader than claim 14 of the '592 Patent. The Court held that the '500 Patent does not exclude the use of amplitude modulation in the phase-modulation mode. (*See* Dkt. No. 88 at 15–16). In contrast, the Court construed phase modulation in the '592 Patent to exclude amplitude modulation. (*See* Case No. 2:16-cv-1302, Dkt. No. 190 at 17–18). Thus, a device that uses amplitude modulation in the phase-modulation mode might practice claim 16 of the '500 Patent but could not literally practice claim 14 of the '592 Patent.

There is also a difference between the '592 Patent's claimed "switch" and the '500 Patent's claimed "controller." These structures serve analogous functions ("for switching"), but it is not clear whether one encompasses the other.

---

[5] The Court did not express an opinion on whether the preamble of the '592 Patent claims are limiting (*see* Case No. 2:16-cv-1302, Dkt. No. 190) and does not do so now. Thus, the Court does not address whether a "card" is a required structure of claim 14 either. *Arctic Cat Inc. v. GEP Power Prods.*, 919 F.3d 1320, 1327 (Fed. Cir. 2019). This does not affect the Court's conclusion, as claim 14 has other limitations not present in claim 16 of the '500 Patent.

In short, claim 14 of the '592 Patent and claim 16 of the '500 Patent are overlapping sets, but the Court is not persuaded that one is a subset of the other. As a result, the Court is not persuaded that the '500 Patent is strictly broader than and necessary to practice the expressly licensed '592 Patent.

Defendants' argument that there is "no practical way to practice" claim 14 of the '592 Patent without also practicing claim 16 of '500 Patent is without merit. So is their argument that the elements of claim 14 are present "in substance" in claim 16. The Federal Circuit has made clear that the relevant inquiry is whether the asserted patent's "claim scope fully encompassed that of the claims of one of the licensed patents." *Endo*, 746 F.3d at 1377 (citing *TransCore*, 563 F.3d at 1279). Under this inquiry, the relationship required is essentially as though the licensed claim is a dependent claim that depends from the asserted claim. Such is not the case here. The inquiry cannot, as Defendants contend, turn on some doctrine of equivalents-like analysis concluding that the differences between the two claims are insubstantial. In any event, Defendants' argument in reliance on Dr. Prucnal's opinions invites the Court to decide issues of fact and credibility on a motion for summary judgment. The Court rightly refuses such an invitation.

Moreover, the Federal Circuit has strongly rejected the notion that implied license applies beyond continuations when the license agreement in question is limited to enumerated patents. In *Endo*, the Federal Circuit held that there was no implied license to patents that claimed priority to the same provisional application as an expressly licensed patent. *Id.* at 1378; *see also Cheetah Omni*, 949 F.3d at 695–96 ("In *TransCore*, we interpreted legal estoppel to provide an implied license to a *related*, later-issued patent that was broader than and necessary to practice an expressly licensed patent." (emphasis added)). The court in *Endo* characterized cases such as *TransCore* and *General Protecht* as "stand[ing] for the rule that a license or a covenant not to sue enumerating

specific patents may legally estop the patentee from asserting *continuations* of the licensed patents in the absence of mutual intent to the contrary." *Endo*, 746 F.3d at 1378 (emphasis in original). The court contrasted those cases with *AMP*, where the contract at issue gave the licensee a license "'to practice, and cause to be practiced . . . throughout the world, each *Subject Invention*'—rather than any specific patents." *Id.* (quoting *AMP*, 389 F.2d at 454) (emphasis in original). In *Endo*, however, "[t]he lack of a continuation relationship between any of the asserted and licensed patents and explicit disclaimer of any other licenses not within the literal terms of the contract [were] dispositive." *Id.*

Here, as noted above, the OCA expressly licenses certain enumerated "Patents-in-Suit" and their familial relations. The OCA is not, like the contract in *AMP*, a license to an idea, invention, or body of technology. Thus, it is no matter that the licensed '592 Patent incorporates the '500 Patent's specification by reference. A license is a covenant by the patentee not to enforce its patent rights against the licensee, and it is a bedrock principle that the claims, not the specification, define scope of the patentee's rights in the first instance. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). The Court therefore declines to use the doctrine implied license to give Defendants more than what was bargained for in 2018. *See Endo*, 746 F.3d at 1378 ("We reject Appellees' invitation to expand the implied license doctrine. You get what you bargain for. And we will not use the implied license doctrine to insert ourselves into that bargain and rewrite the contract.").

For these reasons, the Court concludes that the doctrine of implied license does not bar Oyster's assertion of the '500 Patent. Accordingly, Oyster's MSJ should be **GRANTED** and Defendants' MSJ should be **DENIED** as to implied license.

## V.     CONCLUSION

For the foregoing reasons, Oyster's MSJ is **GRANTED** and Defendants' MSJ is **DENIED**.

**So ORDERED and SIGNED this 23rd day of March, 2021.**


_____
RODNEY   GILSTRAP
UNITED STATES DISTRICT JUDGE